UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth James CROSSMAN and Gerald
Reed Pierce, Defendants-Appellants.

No. 81–1120
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Dec. 11, 1981.

Rehearing and Rehearing En Banc
Denied Feb. 25, 1982.

**608**

Michael R. Gibson, El Paso, Tex., for defendants-appellants.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Appellants Kenneth James Crossman and Gerald Reed Pierce each appeal from their convictions on one count of conspiracy to possess unregistered firearms, 18 U.S.C.A. § 371 and 26 U.S.C.A. § 5861(d). Finding no merit in any of their claims of error, we affirm.

### Facts

On September 10, 1980, in Albuquerque, New Mexico, appellant Crossman was introduced by an informer to Benito Maestas, an undercover agent of the Drug Enforcement Agency who was posing as a gun dealer. Crossman previously had shown interest in purchasing automatic weapons to sell to the Nationals in El Salvador. During a recorded conversation,[1] Crossman bragged to Maestas that his Salvadoran contact in El Paso, Texas had two $500,000 cashier's checks earmarked for the purchase of weapons.

In a series of meetings and telephone conversations, some in El Paso and some in Albuquerque, Maestas and Crossman engaged in lengthy and detailed negotiations as to the prices and types of weapons available. Crossman expressed concern that the weapons could be traced, but Maestas reassured him that they could be traced only to the original owner and no further.

Crossman also indicated that he wanted to make a profit on the deal. Maestas suggested that he might either buy and resell the guns or take a commission on the sale, whichever proved more lucrative. Crossman readily assented. He also stated that he had a "buddy", who proved to be appellant Pierce, who would have to be "cut in" on the transaction.

Crossman later met Maestas in Albuquerque and gave him a piece of paper containing the number and figures on the weapons he wanted: 13 cases of AR–15's, 2 cases of grease guns, 100 sticks of dynamite, and 1 case of hand grenades. The men again discussed prices and ended the meeting with an agreement to keep in contact.

Several days later, Maestas telephoned Crossman and told him that he could complete the deal in a few days. Before concluding the call, they discussed types of weapons and specifications.

Crossman tried unsuccessfully to reach Maestas the next day. When Maestas called him back, Crossman said his clients wanted to take delivery in two days, preferably in the daytime, and that he would go to El Paso to arrange for delivery. He gave Maestas a number where he could be reached.

After some delays, Maestas called Crossman in El Paso to give him the telephone number of his "partner" in the deal, "Al", actually Agent George Hopgood of the Bureau of Alcohol, Tobacco and Firearms, Department of Treasury. "Al", Maestas told Crossman, knew about the deal and could give specifics as to what merchandise was available.

Hopgood met with Crossman in Crossman's motel room but appeared reluctant to deal with an unknown. Crossman eagerly

---

1. Almost all of the conversations between Crossman, Maestas and Hopgood, another DEA agent, were recorded. The tapes were identified and played at trial and the transcripts appear in the record.

offered to name references in Las Vegas, Albuquerque and Boston, if that would help, and said he trusted his El Paso contacts, with whom he had worked for seven years on drug deals and other things. He stressed his clients' immediate needs and pleaded for speed.

Hopgood emphasized that the guns were stolen. He further told Crossman that the prices Maestas had quoted were too low and asked about the arms' destination, stating that he would only deliver in El Paso and that Crossman would have to arrange further delivery. After some negotiating, Hopgood finally agreed to carry out the deal the next afternoon.

The next morning, a series of telephone conversations ensued. Hopgood told Crossman what weapons were available and offered to meet. Crossman said he would get his man and that the "loot" was being made ready. Hopgood gave appellant Pierce the location of the merchandise. When Crossman and Pierce arrived, undercover agent Jimmy Searls, posing as another "partner", showed them the weapons.

That afternoon, Hopgood met with Crossman and Pierce back at Crossman's motel room. The two men expressed concern that the guns were not new. Hopgood offered an explanation which evidently appeased his two clients. Pierce then handed him $5,000 to purchase 25 of the guns. They arranged to meet in the parking lot to make the transfer. After the delivery, Pierce opened the trunk of his car to load the arms inside, agents closed in and arrested both men.

Crossman and Pierce were convicted of conspiracy to possess unregistered firearms as prohibited by 18 U.S.C.A. § 371[2] and 26

U.S.C.A. § 5861(d).[3] Both men appeal, and raise four issues.

### Sufficiency of the Evidence

First, Crossman and Pierce contend that the evidence was insufficient to sustain a finding of conspiracy. In reviewing the sufficiency of the evidence, we must view it in the light most favorable to the government and then ask whether reasonable minds could conclude that the evidence is consistent with any reasonable hypothesis of innocence. *U. S. v. Vincent*, 648 F.2d 1046, 1048 (5th Cir. 1981); *Glasser v. U. S.*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). The answer, clearly, is no. The facts create a granite foundation to support the conviction.

Crossman contends that he was a mere go-between or broker and that the evidence failed to establish an agreement with Pierce. Under the statute, the government had only to show that Crossman and Pierce agreed to possess unregistered firearms and that one of the two did an overt act in furtherance of the agreement. One could properly infer an agreement from Pierce's conduct as established in the record. Maestas' testimony proved that Crossman agreed to buy and resell or take a commission, whichever would prove more profitable. His actions fulfilled the overt act requirement, *see U. S. v. Alvarez*, 610 F.2d 1250, 1255 n.5 (5th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

Crossman and Pierce say that the government had to prove that they agreed that the arms were to be unregistered. This argument is incorrect. All the govern-

2. **Conspiracy to commit offense or to defraud United States**
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
   If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

3. **Prohibited acts**
   It shall be unlawful for any person—
   (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record. . . .

ment had to prove, which it did, was that appellants bought the arms, knowing they were unregistered. *See U. S. v. Vasquez,* 476 F.2d 730, 732 (5th Cir.), *cert. denied,* 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973). This finding also rests on sufficient support in the record.

### Entrapment

For the first time on appeal, Crossman and Pierce urge an entrapment defense, claiming that the government's agents ensnared them. Even though they did not raise or present evidence on this point at trial and did not object to the District Judge's failure to instruct the jury about entrapment, appellants suggest that in presenting its side, the Government somehow made out a prima facie case of entrapment that it then bore the burden of disproving. Whatever agent Maestas' level of involvement, we are certain that it did not demonstrate such unwarranted government action as mystically to constitute a prima facie case on entrapment.

■ Predisposition is the key to this issue. Entrapment "is a relatively limited defense . . . rooted . . . in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government." *U. S. v. Russell,* 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366, 375 (1973), *citing Sorrels v. U. S.,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Here the record completely undercuts appellants' claim and fully demonstrates their predisposition to commit the crime of which they were convicted.

■ Crossman and Pierce also assert that "outrageous conduct" by the government should afford them the entrapment defense. Even if the government's actions rose to such a level, the Supreme Court in *Russell* considered and explicitly rejected this argument. 411 U.S. at 433–434, 93 S.Ct. at 1643–44, 36 L.Ed.2d at 374–75.

■ We point out, moreover, that in this Circuit the defense of entrapment is unavailable unless the defendant admits the facts upon which prosecution is based. *U. S. v. Webster,* 649 F.2d 346, 351 n.10 (5th Cir. 1981) (en banc); *U. S. v. Greenfield,* 554 F.2d 179, 181 (5th Cir. 1977), *cert. denied* 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978). Since appellants, relying on the commission broker theory, in effect deny those facts, they are not entitled to raise the defense of entrapment.

### Jury Instructions

■ Crossman and Pierce challenge the court's failure to give a requested jury instruction concerning registration requirements for firearms. They sought an instruction that the burden of registration of firearms falls upon the transferor rather than the transferee. Although factually correct, that instruction omits the equally important prohibition against a transferee's taking possession prior to registration. It is not error to refuse to give an instruction that incorrectly states the law. As the jury could conclude that Crossman and Pierce knew full well these guns were not registered, their taking possession violated the law irrespective of the burden of registration.

### Dual Representation

■ Finally, Crossman and Pierce maintain that the court should have granted a new trial based on their attorney's representation of both defendants. We disagree. Joint representation by itself offends no constitutional safeguard and does not establish a conflict of interest. "The actual conflict must be demonstrated; mere speculation based on joint representation is not sufficient." *U. S. v. Risi,* 603 F.2d 1193, 1195 (5th Cir. 1979). The fact that a defendant later regrets following his attorney's advice does not furnish grounds for relief under the Sixth Amendment. The defendant "must in some way be prejudiced by the joint representation." *U. S. v. Kranzthor,* 614 F.2d 981, 983 (5th Cir. 1980).

In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court emphasized that the right to a

new trial for violation of the Sixth Amendment right to counsel exists only in instances where a defendant can demonstrate that "an actual conflict of interest adversely affected his [attorney's] performance." 446 U.S. at 348, 100 S.Ct. at 1718, 64 L.Ed.2d at 346. Defendants' new counsel has only made vague assertions that he would have pursued a different trial· strategy, possibly putting Crossman on the witness stand.[4] There simply is no evidence, and defendants point to none, which shows that counsel sacrificed the rights of one defendant for those of another. Without more, we believe defendants have failed to bring themselves within the orbit of *Cuyler, Risi* and *Kranzthor*.

■ The District Judge very carefully addressed this question in chambers. He asked the defendants if they understood the potential for conflict and still wished to be represented by the same attorney. They both replied they did.[5] He had them sign a statement acknowledging this fact. Defendants may not have their cake and eat it too. Having been fully apprised of their right to separate counsel and the possibility of conflicts, they cannot now argue that they did not know.

AFFIRMED.

4. Indeed, there is much question whether counsel would actually have put Mr. Crossman on the witness stand, since any statement he had made tending to exculpate Pierce would likely have incriminated himself. Such actions, in fact, would have provided the very same adverse effect which the appellants assert occurred in the trial below.

5. In Chambers, the Judge raised this problem and preserved it on the record:

THE COURT: Let the record reflect that Mr. Crossman and Mr. Pierce are here along with Mr. McDonald and Mr. Ramos and the reason I called you back here, Mr. Crossman and Mr. Pierce, is because both of you are represented by the same lawyer and under our rules we have the right to try you together and you, of course, have the right to have just one lawyer, but it may develop sometime during the course of the trial one of you may have a defense and the other one may not have a defense as to a particular matter, and there may be a conflict of interest insofar as Mr. Ramos is concerned.

Now, I need to know from you whether you have addressed this possible conflict with Mr. Ramos. I have no idea what the case is about, and may be the same identical deal as to both

of you, but I do need to know since you are represented by the same lawyer that you have gone over this with your lawyer and that you do, both of you, wish Mr. Ramos to represent you in this matter.

MR. CROSSMAN: Yes, sir.

MR. PIERCE: Yes, sir.

THE COURT: I am not trying to embarrass Mr. Ramos, it is just something I am trying to cover my shirttail with, you understand.

And because if it developed that one of you may have a Fifth Amendment·or Sixth Amendment or Seventh, whatever right that develops during the trial and the other one of you didn't, it might create problems for Mr. Ramos. He can't ride two horses at the same time.

And have you executed, Mr. Ramos, one of those waivers, you know, the deal where you are representing two Defendants?

MR. RAMOS: No, Your Honor, I haven't.

THE COURT: Look it over. I am getting copies of the form. Look it over. Since I know nothing about your case, just look it over and if it is agreeable with you I would like you to sign one and put it in the record.