436 So.2d 475 (1983)
STATE of Louisiana
v.
Vivian Lee X KAHEY and Sheral Diana Watson X Kahey.
No. 82-KA-1034.
Supreme Court of Louisiana.
June 27, 1983.
Rehearing Denied September 1, 1983.
*480 William J. Guste, Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., James L. Davis, Dist. Atty., Abbott J. Reeves, Asst. Dist. Atty., for plaintiff-appellee.
Richard V. Burns, Alexandria, for defendant-appellant.
DENNIS, Justice.
The defendants, Vivian and Sheral Kahey, husband and wife, lived together with two other adult women and thirteen minor children in Sabine Parish. The defendants are members of the Islamic religion.
On October 31, 1980, one of the children, twelve year old Arthur Armstead, was found unconscious on the floor. His mother and defendant, Vivian Kahey, tried unsuccessfully to revive him. Arthur was pronounced dead on arrival at a hospital.
The autopsy revealed that Arthur had suffered torture and extreme hunger. His scarred body weighed less than forty-five pounds. His hands and feet bore marks indicating that he had been bound. The child had experienced a severe loss of muscle tone, dehydration, stress ulcers, severe shock, low blood pressure, faulty clotting mechanisms in his blood, and damaged capillaries. These conditions led ultimately to his heart failure and death.
Other witnesses testified that the defendants, and at times the child's mother, subjected Arthur to physical abuse as a result of their religious beliefs. As punishment for his moral shortcomings, Arthur was regularly deprived of food, severely whipped with an extension cord, and bound at his hands and feet.
The defendants were indicted for the second degree murder of Arthur Armstead. They were tried before a judge and convicted as charged. Each was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. On appeal the defendants raise numerous assignments of error. Because we find no reversible error in these assignments, we affirm the defendants' convictions and sentences.

ASSIGNMENT NUMBER ONE
In this assignment of error, the defendants complain of the trial judge's denial of their motion for a change of venue. The motion was based on articles published in the Shreveport Times and the Sabine Index newspapers which identified the defendants as "Black Muslim" murder suspects. At the hearing on the motion, the newspaper articles were introduced into evidence. One defendant, Vivian Kahey, who is a black man, testified that he believed white people were "devils," but that he was not a Black Muslim. The trial judge denied the motion for change of venue, finding that the defendants had not proved that the newspaper articles had any impact upon the general population. Further, the judge concluded that the news information or articles themselves were not sufficient to create a presumption of inflammation of the public against the defendants. The defendants noted for the record their rights under Louisiana Code of Criminal Procedure article 621 to reurge the motion prior to the swearing of the first witness. Subsequently, *481 however, thirteen days before trial, the defendants waived their rights to a trial by jury.
The first question is whether the waiver of the trial by jury effects a waiver of a defendant's right to a change of venue. We conclude that it does not.
Our change of venue rule is not restricted to jury trials. Compare La.C.Cr.P. 622 with Fla.Rules of Crim.Proc., Rule 3.240(a) ("The defendant may move for a change of venue on the ground that a fair and impartial trial cannot be had in the county where the case is pending for any reason other than the interest and prejudice of the trial judge"). Moreover, the grounds for change of venue are broader than those of many jurisdictions and include a consideration of "whether the prejudice, the influence, or the other reasons are such that they will affect the... testimony of witnesses at the trial." La.C.Cr.P. art. 622. That a case will be tried before a judge instead of a jury does not render the venue question moot under our law.[1]
The approach of Article 622 is consistent with the view of a majority of jurisdictions and a leading law reform agency. The A.B.A. Standards Relating to Fair Trial and Free Press § 3.2(e), at 119-20 (App. Draft 1968), provide that "the claim that the venue should have been changed or a continuance granted shall not be considered to have been waived by the waiver of the right to trial by jury or by the failure to exercise all available peremptory challenges." The rationale supporting the standard is contained in its accompanying comments:
(T)he subsection provides that the right to a continuance or transfer shall not be deemed to have been waived by waiver of a jury or by failure to exhaust all peremptory challenges. The suggestion of some courts that such conduct amounts to a waiver seems to require the defendant to take unnecessary risks. If the defendant has satisfied the criterion for the granting of relief, it should not matter that he has subsequently waived a jury, perhaps out of fear that even a jury meeting accepted standards will not be truly free from bias, or has failed to use his peremptory challenges, perhaps because he prefers the ills he has to others he has not yet seen.
Two of the three reported cases that have been decided since the adoption of the A.B.A. standard appear to have adopted its position. See State v. Johnson, 318 N.W.2d 417 (Iowa 1982);[2]Commonwealth v. Dobrolenski, 460 Pa. 630, 334 A.2d 268 (1975). Contra, Brisbin v. Schauer, 176 Colo. 550, 492 P.2d 835 (1971), holding that the waiver of the jury rendered a venue question moot.
The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors. Qualified jurors need not, however, be totally ignorant of the facts and issues involved. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 595 (1975); Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642, 61 L.Ed.2d 751 (1961); State v. Morris, 429 So.2d 111 (La.1983); State v. Goodson, 412 So.2d 1077 (La.1982).
*482 At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights. Murphy v. Florida, supra. If the defendant can demonstrate the actual existence of a fixed opinion as to the defendant's guilt, the individual juror may be excluded by a challenge for cause. If the defendant can demonstrate that actual prejudice, influence, or other reasons exist which will affect the answers of the jurors on the voir dire examination or the testimony of the witnesses at trial, the court must take this into consideration in deciding whether to grant a change of venue. La.C.Cr.P. art. 622; State v. Morris; supra; State v. Goodson, supra; State v. Rodrigue, 409 So.2d 556 (La.1982).
Moreover, although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude may be presumed so as to require a change of venue if the "trial atmosphere" has been "utterly corrupted by press coverage." Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Murphy v. Florida, supra; State v. Morris, supra; State v. Goodson, supra.
The record in this case does not justify a presumption that the defendant could not obtain a fair trial because of a trial atmosphere utterly corrupted by press coverage. The only publicity brought to the court's attention was a series of newspaper articles in the Shreveport Times and the Sabine Index. The articles appeared during a period of about five weeks following the death of the victim. The most strenuous complaint by the defendant relates to an article in the Sabine Index, which appeared on the front page of the November 6, 1980 edition alongside two other stories concerning the alleged murder. The headline read "Black Muslim Charged in Death." The articles explained the tenets of the Black Muslim faith, including the belief that "Christianity was a white man's religion, and the white man was a devil." The defendants complain that this article was especially prejudicial since they are not Black Muslims. The last of these articles appeared fourteen months prior to the beginning of the trial. While the defendant demonstrated that the circulation of the Sabine Index was 4,300 copies, under the circumstances of this case we cannot presume that the trial atmosphere was "utterly corrupted by press coverage."
In State v. Goodson, supra, we found that the introduction of thirty-five newspaper articles and one hundred and eight triple-spaced pages of transcripts of newscasts by local television stations publicizing the famed "Highland rapist" did not warrant a presumption of prejudice, since it did not appear that a Bossier Parish jury would be affected by the Shreveport news media's reports of crimes that occurred in Caddo Parish. In State v. Morris, supra, newspaper and radio publicity, as late as the morning of the trial, which simply announced that the defendant was being tried for the second time, did not justify a presumption of prejudice. The record of the voir dire demonstrated that the defendant was able to select an impartial jury. In State v. Wilkerson, 403 So.2d 652 (La.1981) the introduction in a case involving kidnapping of policemen of newspaper accounts linking the defendants to the "Dixie Mafia," and characterizing both codefendants as fugitives from other states did not justify a presumption of prejudice.
[T]he nature of the publicity in this case was not inflammatory or prejudicial but mainly involved factual accounts. The degree of circulation may have been somewhat widespread (Richland Parish is a small parish), although some [jurors] did testify they heard nothing of the event. The publicity surrounding the event was apparently limited to only a few days after the perpetration of the crime.
403 So.2d at 657. Nor did we find a presumption of prejudice justified in State v. Bell, 346 So.2d 1090 (La.1977), although the massive publicity which had been given to the Black Muslim riots in Baton Rouge several *483 years before the trial resulted in difficulty in selecting a jury.
As in State v. Goodson, supra, we cannot say based on the record, which consists entirely of the quantum of publicity which the events received, that the publicity was of such a character that a juror exposed to it should have been presumed prejudiced regardless of whether he said he could remain impartial. The evidence in this case does not justify a presumption that the trial atmosphere has been "utterly corrupted by press coverage." Dobbert v. Florida, supra; State v. Morris, supra. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and State v. Harper, 430 So.2d 627 (La.1983), for examples of circumstances justifying a presumption of prejudice.
The defendants failed to demonstrate actual prejudice, influence or other reasons existing in the community which would affect the juror's answers on voir dire. There was no evidence introduced during the hearing to suggest that the newspaper accounts had any effect on the community. The only witnesses were the publisher of the Sabine Index, the reporter who wrote the articles, and one of the defendants. The publisher and reporter testified that they were unaware of any strong community sentiment against the defendants. Although the defendants had ample time before trial to discover evidence of public bias, they chose instead to waive their right to a jury and to go to trial without renewing their efforts to change the venue. We, therefore, are confined to the record of the hearing on the motion, which is inadequate to substantiate a claim of prejudice in the collective mind of the community sufficient to deprive these defendants of a fair trial.
Under these circumstances, the trial judge did not abuse his discretion in finding that an impartial jury could have been empaneled or that local hostility toward the defendants would not prevent a fair trial.
Therefore, this assignment of error lacks merit.

ASSIGNMENT NUMBER THREE
In this assignment, the defendants contend that the trial judge erred in ruling upon two pre-trial motions outside their presence. The minutes of the court reflect that on November 20, 1981, the trial court granted a defense motion for a continuance, and on November 29, 1981, the court granted a motion for severance by the victim's mother. At both hearings trial counsel for the defendants, waived the presence of his clients.
Presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only. Therefore, the presence of the defendant is only essential at proceedings which have a reasonably substantial relation to the fullness of the opportunity of the defendant to defend against the charge. Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). From this principle has emerged the general rule that no claim of error, or at least no claim of prejudicial error, can be based upon the exclusion or absence of a defendant, pending his trial on a criminal charge, from the courtroom, or from a conference between court and attorneys, during argument on or discussion of a question of law. See C. Torcia, Wharton's Criminal Procedure § 483 at 342 (12th ed. 1975); 85 A.L.R.2d 1111, 1114. Cf. State v. Monk, 315 So.2d 727 (La.1975); State v. Leblanc, 116 La. 822, 41 So. 105 (1906); State v. Pierre, 39 La.Ann. 915, 3 So. 60 (1887).
The Louisiana rule affords the defendant greater rights. Louisiana Code of Criminal Procedure article 834 provides that the defendant has the right to be present during the making, hearing of, or ruling on a preliminary motion or application addressed to the court. But this right may be waived by the defendant or his attorney, by his voluntary absence or his failure to object to argument or discussion during his absence. See Deschenes v. United *484 States, 224 F.2d 688 (10th Cir.1955). Cf. La.C.Cr.P. art. 831(6); Torcia, supra, at 388, 342.
In the present case, no error occurred. The presence of the defendants was waived by their counsel, and nothing in the record supports their claim that their presence was "prevented."

ASSIGNMENT NUMBER FOUR
In this assignment of error, the defendants contend that the trial court erred in appointing one attorney to represent both of them, thereby depriving them of the right to conflict free representation. After the defendants' retained attorney withdrew from the case, the trial judge set a date for the determination of counsel. On that date, the defendants stated that they intended to retain an attorney within a day or two. When the defendants appeared four days later without counsel, the trial judge appointed an attorney to represent both defendants. There was no objection at that time to the dual representation. The defendants now contend that the joint representation deprived them of effective assistance of counsel.
Multiple representation is not per se illegal and does not violate the Sixth Amendment to the U.S. Constitution or Article 1, Section 3 of the Louisiana Constitution unless it gives rise to a conflict of interest. State v. Ross, 410 So.2d 1388 (La. 1982). See J. Cook, Constitutional Rights of the AccusedTrial Rights § 46 at p. 156 (1974).
The relationship between joint representation and ineffective assistance of counsel has been thoroughly examined by the United States Supreme Court in its opinions rendered in Holloway v. Arkansas, 435 U.S. 475 [98 S.Ct. 1173, 55 L.Ed.2d 426] (1978), and Cuyler v. Sullivan, 446 U.S. 335 [100 S.Ct. 1708, 64 L.Ed.2d 333] (1980). In Holloway, defendant raised the issue of a conflict of interest prior to a joint trial. In this situation, the Court held that the trial judge is required "either to appoint separate counsel or to take adequate steps to ascertain whether the risk (of a conflict of interest) was too remote to warrant separate counsel." In Sullivan, the defendant did not raise the issue of conflict of interest either before and during his separate trial. Rather, the defendant, as in the instant case, raised the issue for the first time after his trial. In this situation, the Court held that a defendant "in order to establish a violation of the Sixth Amendment ... must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." In addition, the Court held that "[u]nless the trial court knows or reasonably should know a particular conflict exists, the court need not initiate an inquiry." See also Wood v. Georgia, 450 U.S. 261 [101 S.Ct. 1097, 67 L.Ed.2d 220] (1981). Recently, in State v. Marshall, supra [414 So.2d 684 (La.1982)], we held that the time at which a concern over the effects of multiple representation is raised is the determinative factor in deciding whether the rules of Holloway or Sullivan are controlling.
State v. Edwards, 430 So.2d 60 (La.1983). See State v. Marshall, 414 So.2d 684 (La. 1982). See also United States v. Crossman, 663 F.2d 607 (5th Cir.1981), cert. denied, 456 U.S. 977, 102 S.Ct. 2243, 72 L.Ed.2d 851 (1982).
Therefore, in a case such as the present one, where the record does not establish that pretrial notification of the possibility of a conflict of interest was given to the court, the defendant must prove that an actual conflict of interest adversely affected his lawyer's performance. State v. Rowe, 416 So.2d 87 (La.1982). An actual conflict of interest is established when the defendant proves that his attorney was placed in a situation inherently conducive to divided loyalties. Zuck v. Alabama, 588 F.2d 436 (5th Cir.), cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).
If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney *485 owes a duty to the defendant to take some action that could be detrimental to his other client.
588 F.2d at 439. When there is such a conflict of interest, the prejudice may be subtle, even unconscious. It may elude detection on review. A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty. Accordingly, where the conflict is real, a denial of effective representation exists without a showing of specific prejudice. Castillo v. Estelle, 504 F.2d 1243, 1245 (5th Cir.1974). See also Zuck v. Alabama, supra, 588 F.2d at 436. A reviewing court cannot, however, presume that joint representation and the possibility of a conflict has resulted in ineffective assistance of counsel. Multiple representation may even be desirable for a particular defendant as a means of insuring against reciprocal recrimination in cases "where a common defense gives strength against a common attack." Glasser v. United States, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1942), Frankfurter, J., dissenting.
The defendants argue that it is "obvious" that a conflict of interest caused by the dual representation existed because (1) since each defendant testified in the case, each was denied effective cross-examination of the other, and (2) each defendant was limited to the development of a theory of his or her defense which would be compatible with the other. Applying the test we have outlined above for the determination of whether an "actual conflict of interest" existed, we conclude that the defendants have failed to meet their burden.
The defense offered by both defendants in this case was that the child died from other causes and that their strict religious beliefs in discipline were the motivation for their mistreatment of the child, rather than a specific intent to kill him or to inflict great bodily harm. The defendants' positions were compatible and entirely consistent, and they have not alleged antagonistic defenses. State v. Edwards, supra. Nothing in the record suggests that one of the defendants tried to shift the blame to the other. Mere allegations that one codefendant intends to point an accusatory finger at the other codefendant as his defense will not be sufficient to support a case for actual conflict of interest. Cf. State v. Medlock, 297 So.2d 190 (La.1974). The defendant's argument that effective cross-examination of the codefendant was denied and compatible defenses were thus demanded is an argument that can be made in any multiple representation case. State v. Ross, supra. The defendants have not distinguished the instant case by demonstrating the existence of a duty on the part of their attorney to take some action that would have been detrimental to one of the codefendants. Zuck v. Alabama, supra. The possibility that another approach should be used in a trial with better results to a defendant exists in every case and is far from making out a deprivation of a constitutional right. State v. Edwards, supra; United States v. Foster, 469 F.2d 1 (1st Cir.1973). The defendants made no showing of how they would have benefited from another strategy. State v. Edwards, supra.
Nor does our own review reveal an actual conflict. Nothing in the record suggests that any of the common situations usually required for conflict of interest existed. One of the defendants was not induced to plead guilty adversely to his interests; a confession of one defendant was not introduced into evidence which inculpated another defendant; testimony of one defendant did not clear the other defendant but inculpate himself; one defendant did not place primary blame on the other, nor did a witness; one defendant did not benefit from compelling the other to testify; counsel for defendant did not also represent a witness for the prosecution, or for the defense; the codefendants did not have conflicting defenses, the codefendants were equally involved in the crime, they did not have disparate criminal records; charges were not dismissed against one defendant on the condition that he testify for the prosecution. See J. Cook, supra at 158-61. It has sometimes been held that joint representation of *486 a husband and wife is a situation inherently conducive to conflict of interest. J. Cook, supra, at 160. The rationale for such a finding is that, under those circumstances, one of the parties may shift the blame, either out of domination or martyrdom. See e.g. People v. Ramsey, 17 Cal.App.3d 731, 95 Cal.Rptr. 231 (1971), United States v. Pinc, 452 F.2d 507 (5th Cir.1971). But see Boehmer v. United States, 414 F.Supp. 766 (E.D.Pa.1976); People v. Seymour, 182 Colo. 262, 512 P.2d 635 (1973). We find no evidence that either of the codefendants in this case tried to shift the blame to the other, or to him or her self.
Since the defendants did not urge the existence of a conflict of interest before this appeal, and they have failed to demonstrate the existence of an actual conflict of interest, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER FIVE
By this assignment of error the defendants contend that they were unconstitutionally deprived of a trial by jury. Although defendants acknowledge that a motion to waive a jury trial was made, they now contend that they did not agree to the waiver.
A written motion to waive jury trial was made on behalf of the defendants by their attorney about two weeks prior to the scheduled trial. As trial began the defense explained that a judge trial had been selected because of the presiding judge's known fairness and because of the inflammatory testimony and evidence which would be offered at trial. The defendants were present during the reference to and detailed explanation of the waiver of jury trial but voiced no objection to the fact that the trier of fact was a judge rather than a jury.
The United States Constitution and the Louisiana Constitution expressly guarantee the criminally accused the right to a jury trial. U.S. Const., amend. VI; La. Const. 1974, art. I, §§ 16, 17. The right to a jury trial is considered to be of major importance in the panoply of rights secured by the Bill of Rights and by the state constitution's Declaration of Rights. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); State v. Muller, 351 So.2d 143 (La.1977).
Because of the importance attached to the right to a jury trial, a trial judge must exercise great care in allowing a criminal defendant to waive the right. For instance, when a defendant elects to enter a plea of guilty and thereby waive his right to a trial by jury and other important constitutional rights, the trial judge must advise the defendant personally of his right to a jury trial, his right to confront his accusers, and of his privilege against self-incrimination and make inquiry of the defendant as to his understanding of these rights and that by pleading guilty he is waiving them. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); State v. Godejohn, 425 So.2d 750 (La.1983). When a defendant chooses to be tried by a judge the concerns for the defendant's understanding of and voluntariness of his waiver of the right to a jury trial are still present. In this situation, only a waiver which is "knowingly and intelligently" made is acceptable. La.C.Cr.P. art. 780. However, when the defendant waives his right to a jury trial by opting for a judge trial, as opposed to when he waives all trial rights by pleading guilty, we have expressly rejected several times a rule which would require the trial judge to personally inform the defendant of his right to a jury trial. State v. Phillips, 365 So.2d 1304 (La.1978); State v. Muller, supra. And we have even approved a waiver made by a defense attorney in a defendant's presence in open court. State v. Phillips, supra.
In the present case, we find no reversible error in the trial court's acceptance of the waiver of jury trial. The record clearly indicates that the decision to proceed with trial by judge was a deliberate trial strategy of the defendants and their counsel. Their earlier motion for a change of venue because of prejudicial publicity had been denied. As the defense attorney *487 stated in his opening remarks, one possible way to avoid an adverse impact of the publicity was to opt for a judge trial. In addition, as also pointed out by the defense attorney, the trial was to produce highly inflammatory testimony regarding a heinous death of a child and it was probably to the defendants' benefit to have a trial by judge, rather than to expose a lay jury to this evidence. Additionally, the record contains no objection of the defendants during the defense attorney's explanation of the waiver.
Perhaps the better practice, as presented in the American Bar Association Standards, would have been for the trial court to have obtained a personal waiver by the defendants either in writing or in open court for the record. See A.B.A. Standards, Trial By Jury 1.2(b) (1968). However, we cannot say that the procedure followed in the instant case is constitutionally defective or violative of the statutory rights of the defendant, given the fact that the record clearly indicates that the option of a judge trial was a trial strategy in which the defendants acquiesced.
Therefore, this assignment of error lacks merit.

ASSIGNMENT NUMBERS SIX AND SEVEN
In these assignments, the defendants complain of the introduction of evidence which revealed the condition of the other twelve children living in the defendant's home. This evidence consisted of the testimony of Ms. Bobby Lafitte, of the Department of Health and Human Resources, Dr. Clarence Poinbeouf, the coroner, Dr. Leigh Dillard, a medical expert, and the other members of the defendant's "family." This testimony revealed that the children suffered from vitamin deficiency, rickets, distended abdomens, abnormal enzyme production in the liver, muscle damage due to enzymes spilling over into the blood stream, and evidence of whippings and beatings. Dr. Poinbeouf testified that many of the children had been "nutritionally abused," causing protein malnutrition and ultimately the distended abdomens due to an enlarged liver. Dr. Dillard testified that abrasions and loss of skin over the knuckles of one of the children resulted from roaches crawling on the child's hands and eating the skin from her knuckles while she was bound. Twenty-one photographs were introduced to corroborate the condition of the children. The defendants contend that all of this evidence constituted inadmissible "other crimes" evidence.
Generally, evidence of other acts of misconduct is not admissible. The introduction of such evidence merely to prove that the defendant is a "bad man" involves constitutional problems because of the danger that a defendant may be tried for a charge of which he has no notice, for which he is unprepared, and which unfairly prejudices him in the eyes of the jury. State v. Goza, 408 So.2d 1349 (La.1982), State v. Abercrombie, 375 So.2d 1170 (La.1979), State v. Prieur, 277 So.2d 126 (La.1973). An exception to the general rule of inadmissibility may exist where the state seeks to introduce evidence of other crimes for some substantially relevant purpose other than to show that the defendant is guilty because he is a man of general criminal character. State v. Harris, 383 So.2d 1 (La.1980); State v. Sutfield, 354 So.2d 1334 (La.1978). Aside from the related offenses admissible as part of the res gestae and convictions admissible for impeachment purposes, Louisiana statutes provide for only three instances where other crimes evidence is "substantially relevant" such as to qualify as an exception to the general rule of exclusion: acts relevant to show intent, knowledge, or system. La. R.S. 15:445, 446. State v. Harris, supra. Admission of another crime committed by the same "system" as the offense charged might also be relevant to show the identity of the defendant as the offender. State v. Talbert, 416 So.2d 97 (La.1982); State v. Hatcher, 372 So.2d 1024 (La.1979); State v. Harris, supra; State v. Waddles, 336 So.2d 810 (La.1976). Other jurisprudentially recognized exceptions include other crimes evidence introduced to show motive, State v. *488 Lafleur, 398 So.2d 1074 (La.1981), State v. Sutfield, supra, State v. Dowdy, 217 La. 773, 47 So.2d 496 (1950), prior sex crimes committed against the same prosecutrix, State v. Alciese, 403 So.2d 665 (La.1981) and cases cited therein, and evidence of criminal acts of the accused constituting admissions by conduct intended to obstruct justice or avoid punishment for the present crime, State v. Burnette and Granger, 353 So.2d 989 (La.1978). See, Comment, Other Crimes Evidence in LouisianaTo Show Knowledge Intent, System, Etc. In The Case In Chief, 33 La.L.Rev. 614 (1973). Once a determination is made that the other crimes evidence is presented for one of these "substantially relevant" purposes, the court then has the obligation to balance the probative value of the evidence against its prejudicial effect before the evidence can be admitted. State v. Germain, 433 So.2d 110 (La.1983); State v. Humphrey, 412 So.2d 507 (La.1982) (on rehearing); State v. Harris, supra; State v. Sutfield, supra; State v. Prieur, supra.
In cases of child beatings or abuse, we have found evidence of other instances of misconduct against children or the family admissible under a variety of exceptions: intent. State v. Germain, supra, State v. Bradford, 259 La. 381, 250 So.2d 375 (1971); identity, State v. Germain, supra, State v. Humphrey, supra, and the comments of Lemmon, J. concurring in State v. Germain, supra; and motive, State v. Lafleur, supra. We have not recognized, however, an additional exception to the rule of exclusion which would establish an automatic "substantial relevancy" for other crimes evidence in cases of child beatings or abuse. See State v. Morris, 362 So.2d 1379 (La. 1978).[3] See also Harvey v. State, 604 P.2d 586 (Alaska 1979); Note, EvidenceChild Abuse, 16 Land and Water Law Rev. 769 (1981).
La.R.S. 15:445 provides that "in order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transactions." The relevancy of other crimes to prove intent stems from the doctrine of chances. The attempt is merely to discover the intent accompanying the act in question; and the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent. The argument is based purely on the doctrine of chances, and it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand. 2 Wigmore, Evidence, § 302 p. 200 (3rd ed. 1940). Professor McCormick has stated that for questions of intent, the purpose of which such evidence may be relevant is to show by similar offenses that the act for which the defendant is on trial was not inadvertent, accidental, unintentional, or without guilty knowledge. See McCormick, Evidence § 190 at 450 (Cleary ed. 1972). Before evidence of other crimes is admitted as proof of intent, however, three prerequisites must be satisfied: (1) the prior acts must be similar, La.R.S. 15:445, Wigmore, supra; (2) there must be a real and genuine contested issue of intent at trial, State v. Monroe, 364 So.2d 570 (La.1978), State v. Nelson, 357 So.2d 1100 (La.1978), State v. Germain, supra; (3) the probative value of the evidence must outweigh its prejudicial effect, State v. Harris, supra, State v. Prieur, supra.
We find that in the current case, the evidence of the condition of the defendants' family was evidence of intent, and was admissible as a recognized exception to the rule of exclusion. The defendants were charged with the specific intent second degree *489 murder which is defined in La.R.S. 14:30.1 as "... the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm." The issue of intent was real and genuinely contested at the trial. The defendants asserted, in the opening statement of their attorney, that the actions that led to Arthur's death were merely part of their scheme of discipline for the child, and that they never intended to harm him. By this assertion, the defendants' direction put the question of the requisite criminal intent for the commission of the crime at issue. State v. Germain, supra. See State v. Morris, supra, 362 So.2d at 1381, n. 2. The evidence was substantially relevant to prove that the injuries caused to Arthur Armstead were not inadvertent, accidental, unintentional, or without guilty knowledge. State v. Harris, supra. We do not find merit in the defendants' contention that the evidence was inadmissible as proof of intent under La.R.S. 15:445 because it did not constitute evidence of "similar acts." Essentially, the defendants argue that the offenses against the other children constituted only cruelty to juveniles, while the state has alleged that against Arthur they constituted second degree murder. While this statement contains undeniable truths, it is only so because of Arthur's untimely death. La.R.S. 15:445 does not speak in terms of "similar crimes," but rather "similar acts." The acts toward Arthur were essentially the same as the acts toward the other children, while they may have been more intense and severe. Given time, it may well have been that any of the other children in the household may have expired, and the defendants cannot argue that the mere fact that they did not die changed the nature of the acts against them.
We also find that the probative value of the other acts evidence outweighed its obvious prejudicial effect. The defendants placed the issue of intent squarely before the trier of fact as their sole defense to the charges against them. The defendants placed at issue the possibility that Arthur's death was a bizarre, unintentional result of discipline, and we cannot say that under this circumstance, introduction of evidence revealing a consistent pattern of severe brutality was unduly prejudicial. See State v. Germain, supra.
Finally, the defendants argue that the other crimes evidence was inadmissible because they received no prior notice or hearing. The state, within a reasonable time before trial, must furnish in writing to the defendant a particularized statement of the other acts or offenses it intends to offer, specifying the exception to the general exclusionary rule upon which it intends to rely for their admissibility. State v. Germain, supra; State v. Goza, supra; State v. Prieur, supra. We have reviewed the record in the case, and we find that the state did not give the defendant the required "Prieur" notice of its intention to introduce the evidence of the condition of the other children. However, an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La.C.Cr.P. art. 841; State v. Morris, 429 So.2d 111 (La.1983). In the instant case, while the defendants strenuously objected to the introduction of the other crimes evidence on the ground that it did not qualify under any of the exceptions to the general rule of exclusion, there was no objection to the lack of Prieur notice. Nor did the defendants ask for a continuance to prepare for the evidence or for a hearing to determine its admissibility. Under these circumstances, we hold that the defendants waived their right to prior notice and hearing. Cf. State v. Morris, supra.
Moreover, in his relevancy objection to the introduction of the other crimes evidence, defense counsel noted that all of the parties, including the judge, had already heard all of this evidence at the various pretrial hearings. In his opening statement, he made reference to the inflammatory and prejudicial evidence that would be taken during the trial, apparently referring to the other crimes evidence. The cross-examinations of the state's witness were competent and displayed thorough pretrial *490 preparation. Nothing suggests that the defendants were in any way surprised by the presentation of the evidence of the condition of the other children in the household. Cf. State v. Germain, supra. While prejudice is not a requirement for the establishment of a Prieur violation, the defendants' awareness of the eminent introduction of the other crimes evidence and their decision to object only on relevancy grounds, fully supports a finding of waiver.
Accordingly, these assignments of error have no merit.

ASSIGNMENTS OF ERROR EIGHT AND EIGHTEEN
By these assignments of error defendants contend that the trial court erroneously allowed state witnesses to give hearsay statements.
On appeal the defendant objects to certain testimony elicited from the state witness, Bobbye H. Lafitte, a state social worker who visited the home of the defendants soon after the victim, Arthur, was brought to the hospital. Specifically, the defendant complains of testimony of Ms. Lafitte regarding conversations with the three wives who resided in the house at the time of the victim's death. The record reveals that the defendants' attorney did not object on the grounds that the evidence was hearsay, but to the lack of a foundation.
The defendants also contend that the trial court erred in eliciting certain testimony from the defendant's thirteen year old daughter, Monica Meadows. At the conclusion of her testimony, the trial court, in an effort to clarify her version of the events surrounding Arthur's death, questioned Monica regarding what Monica's younger brother, Vivian, Jr., had told her about Arthur declining a salad offered him on the morning of his death. The trial judge paused and expressly gave each side an opportunity to object to the question before the child answered it. However, the record shows that each lawyer declined the invitation to object to the line of questioning.
Accordingly, these assignments of error lack merit.

ASSIGNMENT NUMBERS ELEVEN AND TWELVE
By these assignments of error defendants contend that the trial court erred in allowing a state witness to give opinion testimony.
Specifically, the defendants complain of the questioning of the state witness, Gaye Nell Van Dyke Goff, one of the adult women of the household. In her testimony, Ms. Goff named the children from whom food was withheld. She was then asked by the prosecution whether any one of the children was more frequently discriminated against in the withholding of food. She responded that the decedent, Arthur, was. The defendants' attorney objected to the use of the word "discriminate," and the trial judge overruled the objection. The witness was further questioned as to why the decedent, Arthur, stole food. The defense attorney objected to this question on the ground that it called for an opinion. The trial court overruled this objection. The witness, Ms. Goff, answered that Arthur was not getting enough food to eat at his regular meals since his portions had been cut as a means of punishment. She said that Arthur was tied up to prevent him from stealing food. On appeal the defendants contend that the witness gave an inadmissible opinion. They argue in the alternative that the evidence should be barred because the state did not lay a foundation as to the witness's qualifications to make the judgments offered and that the court never ruled that the witness was an expert.
Generally speaking, a witness can testify "only as to facts within his knowledge, and neither as to any recital of facts heard by him, nor as to any impression or opinion that he may have." La.R.S. 15:463. However, in applying this rule limiting opinion we have recognized that it states a guiding principle containing several variables. The terms "fact" and "opinion" denote merely a difference of degree of concreteness of description or a difference in nearness or remoteness *491 of inference. The opinion rule operates to prefer the more concrete description to the less concrete, the direct form of statement to the inferential. State v. Wheeler, 416 So.2d 78 (La.1982). For this reason we have allowed certain testimony which might be termed "opinion" when it is clear from the circumstances that the witness drew a reasonable inference from his personal observations. See State v. Vanderhoff, 415 So.2d 190 (La.1982). However, in deciding whether to admit such testimony the trial judge should consider several factors, including whether the testimony relates only to a collateral matter or to the ultimate issue of the case. Cf. State v. Wheeler, supra. See McCormick, Evidence, § 12 at 26-29 (Cleary ed. 1972).
In the present case the trial court did not err in allowing the testimony of Ms. Goff. She was present in the household during the occurrence of events which culminated in Arthur's death. Her testimony is one primarily of facts about the food that Arthur received and about the treatment of all the children in general. The statements of which the defendants complain are reasonable inferences drawn from the witness's personal observations. Further, the testimony objected to did not relate as much to the ultimate question of whether the defendants deprived Arthur of food with the criminal intent to kill or cause great bodily harm but with the more peripheral question of why Arthur had stolen food.
The defendants' arguments that Ms. Goff's testimony should have been excluded because she was not properly qualified as an expert are without merit. Ms. Goff was never offered as an expert witness. She was offered as a witness to the harsh treatment which she observed inflicted upon Arthur and the other children.
Accordingly, these assignments of error lack merit.

ASSIGNMENT NUMBERS THIRTEEN, FOURTEEN, AND SEVENTEEN
By these assignments of error the defendants contend that the trial court erred when it overruled defense objections to allegedly irrelevant testimony.
These assignments focus upon the examination of two witnesses, Helen Armstead X Kahey, one of the adult women of the household, and Monica Meadows, the natural child of the defendants.
Helen Armstead X Kahey was asked by the prosecutor whether one of the "wives" of the household was favored over the others. The defense objection to relevancy was overruled. Ms. Armstead responded that the defendant Sheral, Vivian's lawful wife, was favored. Later, she was asked whether one of the children of the house was favored over the others. After the defendants' objection to relevancy was overruled, she replied that the defendants' child, Monica Meadows, was the favored child. She testified further that Arthur, the decedent, had been accused of attempting to have sex with Monica.
Later during the trial Monica was asked whether anyone in the household would have given Arthur food if the defendant Vivian had forbade them. After argument by defense counsel, the trial judge permitted the state's attorney to ask Monica whether she would have so disobeyed Vivian. Monica replied that she would not have given Arthur food in disobedience of Vivian's instructions.
All evidence which is relevant to a material fact issue, necessary to be known to explain a relevant fact, or which supports an inference raised by such a fact is admissible, La.R.S. 15:435, 441, except as otherwise provided by the constitution of the United States or this state, by law or by rule of this court. State v. Ludwig, 423 So.2d 1073 (La.1982); Cf. Fed.R.Evid. 402. Our law defines relevant evidence as "that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent." La.R.S. 15:441. Relevancy of evidence is determined by the purpose for which it is offered. La.R.S. 15:442. Cf. Fed.R.Evid. 401. Generally, an appellate court places great weight upon a trial *492 court's ruling on the relevancy of evidence, and should not reverse this ruling unless a clear misuse of discretion has occurred. State v. Walker, 394 So.2d 1181 (La.1981).
Applying these precepts to the instant case we conclude that the trial court did not err in allowing the introduction of the contested testimony. The state's theory was that the defendants, along with a third adult member of the household who was tried separately, acted over a period of time in concert in the harsh treatment of Arthur which resulted in his death. The testimony of the witness Armstead that Vivian's lawful wife Sheral was favored by him tends to support the conclusion that they acted together, especially in light of the other evidence which clearly indicates that they ran the kitchen together and made the decision to deprive Arthur of food. The testimony that Monica, the defendants' child, was favored by the defendants is relevant because it tends to show that their motive for harming Arthur was in retribution for his sexual advances toward their child. Likewise, it tends to refute defendants' claims that Arthur's death was an accidental result of moral or religious discipline.
Monica's testimony that she would not have fed Arthur against Vivian's orders showed Vivian's influence and control in the house. This evidence was relevant because it tended to prove her complicity in Arthur's starvation.
Accordingly, these assignments of error are without merit.

ASSIGNMENT NUMBERS FIFTEEN AND SIXTEEN
By these assignments the defendants contend that the trial court erred in its rulings on objections to leading questions.
In assignment number fifteen the defendants argue that the trial court erred when it sustained the prosecution's objection to a leading question. During the cross examination of Helen Armstead, the mother of the victim, by the defense counsel the following colloquy occurred:
Q: Did you ever stop to think that your son might have died of natural causes?
A: I thought that at first.
Q: You thought that at first, and something has changed your mind since then?
A: I changed my own mind.
Q: You were surprised by the fact that he passed away, weren't you?
A: Yes, sir. Wait a minute, I wasn't exactly surprised in a way.
Q: How do you mean that?
A: After I saw Arthur, saw him good that morning, I was scared to death that something was going to happen to him.
Q: When you saw him in a weakened condition that morning?
A: Yes, sir.
Q: But you told me up and prior to that time you had absolutely no idea anything was the matter with him, didn't you, that's just what you said?
A: I told you up until that time death had never crossed my mind.
Q: Well, had you thought that anything was wrong with him prior to that time?
A: Just hungry.
Q: Your son didn't die of malnutrition though, did he?
At this point the prosecutor objected to the examination as leading and the trial judge sustained his objection.
Assignment number sixteen relates to the direct examination by the state of the victim's eleven year old sister, Keesha. During this questioning, the state inquired several times regarding the whippings administered to Arthur. When the state asked whether the whippings took place for a "pretty long time," the defendant's attorney objected to the question as leading. The trial court sustained this objection and the rest of Keesha's examination was completed without objection.
A leading question is one which suggests to the witness the answer he is to deliver *493 and though framed in the alternative, is inadmissible when propounded to one's own witness, unless such witness be unwilling or hostile. La.R.S. 15:277. However, ordinarily leading questions are permitted on cross-examination. McCormick, Evidence, § 6 at 9 (Cleary ed. 1972); Fed.R.Evid. 611. And, the rule against leading one's own witnesses is relaxed, as a matter of necessity, even during the direct examination of certain witnesses such as children, weak-minded adults, and persons deficient in the English language. McCormick, supra, at p. 10; State v. Vanderhoff, 415 So.2d 190 (La. 1982).
In the instant case the defense attorney's question "Your son didn't die of malnutrition, did he?" is obviously a leading question, for it clearly suggests an answer to the witness. La.R.S. 15:277; McCormick, supra at p. 9. However, the question was asked during cross-examination, a time when leading questions are ordinarily permitted. McCormick, supra; Fed.R.Evid. 611. Nevertheless, we do not believe that the trial court committed reversible error when it limited the defendants' counsel in the questioning of Helen Armstead. This case produced considerable expert medical opinion concerning the actual causes of Arthur's death. The medical testimony given at trial clearly demonstrated the role of starvation in Arthur's death. No expert testimony was offered by defendants to refute the findings of two physicians that Arthur suffered from severe malnutrition. In the face of their extensive testimony, the probative effect of a possible single contrary answer by the lay witness Armstead would have been slight. Thus, the trial court could within its discretion exclude this evidence because its probative value was substantially outweighed by considerations of undue delay, waste of time, or needless presentation of cummulative evidence. See, State v. Ludwig, 423 So.2d 1073 (La. 1982); See also, Fed.R.Evid. 403; Weinsteins's Evidence § 403[06] (1982).
The defendants' complaint of the ruling of the trial court sustaining their objection to the prosecutor's leading questions of the state witness Keesha is meritless. The leading direct examination of Keesha was objected to by defendants' attorney and the objection was sustained by the trial court. The remainder of her testimony was completed without objection. The trial judge may have erred in sustaining the objection because in Louisiana leading questions may be posed to children even during direct examination. See State v. Vanderhoff, 415 So.2d 190 (La.1982). However, any error on this issue inured to the defendants' benefit and they have no grounds to complain on appeal.
Accordingly, these assignments of error lack merit.

ASSIGNMENT NUMBER TWENTY-ONE
By this assignment defendants argue that the trial court erred in allowing the State to require one of the defendants, Sheral Kahey to express an opinion.
During cross-examination the prosecutor showed Sheral Kahey photographs of the victim, Arthur, and inquired whether she believed that punishment which would leave scars like those displayed in the photographs would be proper punishment for a child who had committed an infraction. Defendants' attorney objected that the question would call for an answer which would also relate to other people who had punished the child. The trial court narrowed the inquiry to allow a response only on the defendant's opinion regarding the particular scars. The defense attorney objected to the relevancy of this questioning, and his objection was overruled. The defendant witness responded that if the infraction were serious enough the punishment which would result in such scarring would be proper. On appeal the defendants argue that the questioning called for an impermissible opinion and also that the testimony was irrelevant.
We find no error in the trial court's allowing the question and answer. As a general rule lay witnesses should not give opinion testimony. La.R.S. 15:463. However, lay witnesses may testify as to their inferences drawn from their personal experiences. *494 See State v. Vanderhoff, 415 So.2d 190 (La.1982); See also the discussion of assignments numbers eleven and twelve, supra. Nevertheless, we need not delve deeply into the issue of whether the evidence was impermissible opinion, for defendant's attorney did not raise this objection at trial. La.C.Cr.P. art. 841.
Defense counsel did raise a relevancy objection to the questioning. However, we believe that the trial court properly narrowed the inquiry and allowed Sheral to testify regarding her view of the scars inflicted upon Arthur. Her testimony regarding the reasonableness of her punishment was relevant because it tended to prove the existence of her specific intent to kill or to inflict great bodily harm upon Arthur and it tended to impeach her testimony that she only intended to discipline him.
Therefore, the assignment of error lacks merit.

ASSIGNMENT NUMBER TWENTY-TWO
In this assignment the defendants contend that the trial court erred in denying their motion for a new trial because the evidence is not sufficient to support a finding of guilty beyond a reasonable doubt.
The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. State v. Graham, 422 So.2d 123 (La.1982). A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying this standard to the instant case, we conclude that the evidence is constitutionally sufficient and supports the convictions of the two defendants.
The defendants were found guilty of the second degree murder of the victim, Arthur. Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La.R.S. 14:30.1. The statute expressly requires that the offender possess "specific intent," which is defined by our law as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10. Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. La.R.S. 15:445. State v. Graham, 420 So.2d 1126 (La.1982); State v. Fuller, 414 So.2d 306 (La.1982). See also, State v. Chism, 436 So.2d 464 (La.1983).
The medical and lay testimony in the instant case indicated that Arthur died from traumatic injury and heart failure caused by the defendants. Dr. McCormick, the physician who conducted the autopsy, testified that the cardiac tamponade which caused the child's heart failure and death was the result of a severe protein deficiency. He testified the child's malnutrition was evinced by his lack of weight, his protuberant abdomen and the absence of rigor mortis over twelve hours after his death. He said that the contusions, abrasions, and lesions on Arthur's body had been caused by a bent object such as a coat hanger. Other witnesses corroborated the doctor's evidence by testifying to the starvation, beating and binding of the child by the defendants. The evidence suggests no cause of death which cannot be attributed to the defendants. Consequently, there was abundant evidence from which a rational trier of fact could conclude beyond a reasonable doubt that the defendants' actions caused Arthur's death.
Moreover, the evidence was sufficient to support a finding by a rational trier of fact that the prosecution had carried its burden of proving that the defendants committed these acts with specific intent to kill or to inflict great bodily harm. Vivian, as an authority figure in the household, allotted *495 food to each member. In September, only about one month before Arthur's death, Vivian began to treat Arthur very harshly. For a time, Vivian made the child sleep in the family truck. He later allowed the child to sleep on the kitchen floor, but required that his hands and legs be bound at night. Several witnesses testified that Vivian severely beat Arthur more than fifteen times with an extension cord because of the child's laziness. Vivian ordered Arthur to fast, without food or water, for two days not long before his death. One witness testified that Vivian, who spoke of himself as the sun which gave power to his family, claimed that Arthur dried up and died because he had deprived him of his power. Vivian also told this witness that he wanted to take power away from Arthur "[B]ecause the boy was corrupt and evil."
The record indicates that Sheral's role nearly equaled her husband's in causing Arthur's starvation and beatings. Sheral was present the entire time during which Arthur deteriorated and became malnourished. She aided her husband in the apportionment and preparation of the food for the household. Although toward the end of his life Arthur's body showed signs of starvation, such as his protruded stomach, Sheral denied any knowledge of his debilitated condition. She was primarily responsible for binding Arthur's hands and feet to prevent him from walking about the kitchen at night and obtaining food. She personally administered several severe beatings upon Arthur in the month before he died.
Accordingly, this assignment of error lacks merit.

DECREE
For the foregoing reasons, the defendants' convictions and sentences are affirmed.
AFFIRMED.
BLANCHE and MARCUS, JJ., concur.
NOTES
[1] In Butzman v. United States, 205 F.2d 343 (6th Cir.), cert. denied, 346 U.S. 828, 74 S.Ct. 50, 98 L.Ed. 353 (1953) once considered the leading case, the court of appeal held that when the defendant elected to be tried by the district judge he waived his claim that the court abused its discretion in denying his motion for a change of venue. See 33 A.L.R.3rd 17 at p. 145. However, the Butzman approach has been severely criticized and is not representative of the modern view. See State v. Johnson, 318 N.W.2d 417 (Iowa 1982).
[2] Under Iowa Code Ann. § 778.2, the defendant may obtain a change of venue on the ground that he "cannot receive a fair and impartial trial owing to the prejudice of the judge."
[3] Justice Tate noted that "different considerations may obtain if the accused affirmatively raises specific issues of fact which the otherwise inadmissible other crimes evidence becomes relevant to rebut." Among these considerations would be a case "where a defense that the child-injuries alleged to have been committed by the accused were accidental in nature or the result of what was intended to be normal and reasonable discipline." 362 So.2d at 1381, n. 2.