# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**15-518**

STATE OF LOUISIANA

VERSUS

JAMAL ANTHONY CHARLES

\*\*\*\*\*\*\*\*\*\*
**APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, DOCKET NO. 11-705
HONORABLE CHARLES L. PORTER, DISTRICT JUDGE**
\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Jimmie C. Peters and Marc T. Amy, Judges.

**AFFIRMED.**

Edward K. Bauman
Louisiana Appellate Project
P.O. Box 1641
Lake Charles, LA  70602
(337) 491-0570
**Attorney For Appellant/Defendant: Jamal Anthony Charles**

M. Bofill Duhe
District Attorney
Angela B. Odinet
Assistant District Attorney
Sixteenth Judicial District
St. Martin Parish Courthouse
415 Main Street
St. Martinville, LA  70582
(337) 394-2220
**Attorney for Appellee:
State of Louisiana**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

Jamal Anthony Charles "Defendant" was convicted in a bench trial of the first degree murder of four-year-old Ray'neisha Hudson, a violation of La.R.S. 14:30, and second degree cruelty to a juvenile of three-year-old Raymon Hudson, a violation of La.R.S. 14:93.2.3.[1] On October 28, 2014, Defendant was sentenced to serve life imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence, for the conviction of first degree murder. For the conviction of second degree cruelty to a juvenile, he was sentenced to serve forty years at hard labor, the sentences to run concurrently.

Vanessa Edmond and Defendant lived together in a trailer with their child and Ms. Edmond's three children from a previous union. On January 27, 2011, Ms. Edmond's daughter, Ray'neisha, was found dead in the trailer. The cause of death was scalding by forceful immersion in very hot water. Ms. Edmond's son, Raymon, suffered second degree burns also from being immersed in hot water.

At trial, Ms. Edmond acknowledged she was charged with cruelty to juveniles and accessory after the fact to first degree murder. She testified she had one child with Defendant, Janae Charles, date of birth 7/8/09, and three children of her own, Ray'miyah Hudson, date of birth 12/30/05, Ray'neisha Hudson, date of birth 1/21/07, and Raymon Hudson, date of birth, 12/14/07. Ms. Edmond testified Ray'neisha and Raymon were not potty-trained. She explained they were in diapers and could not change themselves.

---

[1]The charging instrument spells the victim's name as Rayneisha; however, in the transcript it appears as Ray'neisha.

Ms. Edmond testified she worked a shift at Cash Magic, located in Broussard, Louisiana, from 10:00 p.m. on January 25, to 6:00 a.m. on January 26, 2011. Cash Magic was about a fifteen or twenty minute drive from her home. She testified she would ordinarily arrive home from work around 6:20-6:30 a.m. and would usually sleep until about noon. Ms. Edmond claimed she awoke around noon on January 25, and fixed herself and the children tuna fish sandwiches. She did not recall any of the children complaining about anything. Later that evening, around 9:50-9:55 p.m., Defendant took her to work. She admitted she left her three children at the trailer alone, knowing Defendant was not planning to return to the trailer but was meeting friends at a local bar. Janae was not at the trailer that night as Defendant took her to stay with a friend.

Ms. Edmond testified Defendant called her at work around 5:00 a.m. and told her he had a headache from smoking a "stale cigarette." Defendant picked her up from work on the morning of January 26, around 6:20-6:30 a.m. The children were not with him. Ms. Edmond recalled arriving at her home around 6:45 a.m. She testified she went to sleep without checking on the children and did not wake until around 12:00 p.m. She recalled fixing three bowls of cereal for the children and bringing it to their room. Raymon was waking and told his mother he had a "bo-bo" on his foot. Ms. Edmond testified she looked at his foot, noticed a blister on it, and told him she would take him to the doctor. She further testified she began calling Ray'neisha's name, trying to wake her, but she would not awaken. Then, the following exchange occurred on direct examination:

Q    At what point did you find Ray'neisha?

A    After I was calling for - - After I was calling her name for her to get up and she didn't get up, so I tapped her - - I tapped her and she didn't get up, so I pulled the covers back and then I had panicked.

Q    You pulled the covers back and what?

A    And I panicked, cause she didn't - - she didn't have any skin on her legs.

Q    What did you do at that point?

A    I think I - - I ran, I was looking for the phone, and I went to the front - - I went to the front room and I think that's where the phone was, in the front room, and I was just saying - - and I was asking what happened and I just grabbed - -  and  I  called  my sister.

     . . . .

     "What happened? What happened?" Nobody was answering me. I kind of lost it. I don't - - I don't know.

Q    Why did you call your sister?

A    I didn't - - I didn't know what to do. I was - - And me and my sister, we close, and I didn't know what to do, so I called her. And she told me to call 911.

Q    Why didn't you call 911 right away?

A    I was - - I don't know. It's, like, I was out my mind; I didn't know what to do.

     . . . .

Q    Vanessa, was Jamal present during the 911 call?

MS. EDMOND:

A    Yes, sir.

Q    Was he saying anything?

A    He just was doing what I asked him to do, what the - - the 911 people, when they told me to take her and put her on the floor, I told him to do that and that's what he done. He didn't say anything, no. When he put her on the floor - - When he took over to do the CPR, I just was repeating back what the lady was telling me to do.

     . . . .

4

Q    And when the Acadian Ambulance people arrived, they informed you Ray'neisha was dead, correct?

A    Yes.

Ms. Edmond denied putting her children in a tub of hot water. She testified when she disciplined her children she would spank them with her hand or put them on their knees. She also testified Ray'miyah never put Ray'neisha or Raymon in the bathtub to bathe them.

On cross-examination, Ms. Edmond testified the hot water heater in the bathroom came with the trailer she was renting and was maintained by the landlord.

Q    Okay. It's [water heater] in pretty bad shape, is it?

A    Yes.

Q    Had you complained to the landlord about it?

A    No. No, I didn't.

Q    Had the water ever come out the tub before scalding?

A    The water was hot out the tub and the sink.

Q    All right. Would it sometimes not be hot?

A    I didn't hear you. I'm sorry.

Q    Would it sometimes not be hot? Would it sometimes come out hotter than others?

A    It would be hot. It would be the same, to me.

Q    Okay. Did you ever burn yourself?

A    No.[2]

Defendant testified he was living with Ms. Edmond and her three children at 1123 Spencer Loop in January 2011. He denied putting Ray'neisha or Raymon in the bathtub to scald them or cause Ray'neisha's death. Defendant testified he

---

[2]The trial transcript indicates during cross-examination, Defendant's attorney referred to Ms. Edmond's grand jury testimony and played parts of her interview with the police. However, the record before this court does not reflect either of these items were introduced and admitted into evidence.

called Adam Reed to accompany him to shoot pool around 6:00 p.m. on January 26. After shooting pool and riding around, he returned home alone around 9:00-9:15 p.m. and awakened Ms. Edmond so that she could get dressed to go to work. According to Defendant, he started dressing to go out to a club, the "Gemini," in Ms. Edmond's presence. Thus, she knew he would not be home with her children that night.

Defendant drove Ms. Edmond to work arriving there a little after 10:00 p.m. He estimated he arrived at the Gemini around 10:30-10:40 p.m., where he met his friends, Adam, P.J., and Emmanuel. They stayed until the club closed, a little before 12:00 a.m. At some point, Defendant returned to the trailer to pick up his cell phone. He estimated he was there for five minutes. While he was at the trailer, Defendant called Adam on the land line to let him know he was coming over. Defendant did not check on the children. According to Defendant, he left the trailer to pick up his friend Adam, and, after selling some illegal drugs, the two returned to Adam's grandmother's home where they played video games. He testified he left Adam's grandmother's home around 5:00 a.m. and returned to the trailer. He claimed he arrived at Ms. Edmond's place of employment before she got off and, while he waited for her, he took a nap in the car. Ms. Edmond and he returned to the trailer. Defendant testified in pertinent part as follows:

A    When she came out to the car, we left and we went straight to the house.

Q    Okay. And what time did you get to the house, if you remember? Well let me stop you right there. Did y'all go straight home when Vanessa got off of work?

A    Yes, sir.

Q    All right. So if the punch clock shows her getting off at 6:18, I think it was, that's what time she came out to the car; is that what you're saying?

6

A     Yes, sir.

Q     And y'all went home?

A     Yeah.

Q     Okay. When you got home, was anybody up?

A     When I - - When we got in the house, we - - Vanessa had went to turn on the stove, cause she said she was cold, and then she went to the bathroom, cause she had to pee. But I didn't really - - We didn't check - - I don't think we had looked in - - I didn't look in on the kids. I don't know if she did or not.

Q     I'm asking about you. When y'all got in, who turned on the stove?

A     Vanessa.

Q     And then she went to the bathroom?

A     Yes, sir.

Q     What did you do?

A     I went straight to the room.

Q     What room?

A     To the back room.

Q     Which is what?

A     In the bedroom, our bedroom.

Q     All right. When you got to the bedroom, what did you do?

A     I got undressed and I grabbed a Black[3] up out of my pants and went lit it on the stove and came get back in the bed.

Q     What else?

A     I was looking at the TV. I was laying down watching TV.

Defendant recalled he was still awake when Ms. Edmond got into the bed.

The next thing he remembers was Ms. Edmond tapping him and telling him something had happened to "Mon."

Q     What did she tell you?

A     She said look like something had bit Mon.

---

[3] Emmanuel Barnes identified a "Black" as a "Black & Mild," which he described as a tipped cigar.

Q    Okay.

A    And I looked and then she - - I said, "Well let me see." I was - -
She was just waking me up out of my sleep. And when I
looked at, I'm like, "Damn."

Q    She didn't seem excited about it?

A    Sir?

Q    She didn't seem excited about it?

A    You said excited?

Q    Did she seem upset?

A    Upset? Not really upset. She wasn't really upset. Nah, I don't
think she was upset.

Q    All right. Did she seem worried?

A    A little bit.

Q    What did she say to you, if you remember.

A    She said something had bit Mon. And when I got up to look at
it, I said, "Man, I don't know what that is." I told her maybe we
should take him to the doctor or hospital.

Q    And then what happened?

A    Well she was going to get him some clothes down the hallway.

Q    Where was Mon when she was getting clothes?

A    He was sitting on my lap.

Q    Okay. She left him with you?

A    Yes, sir.

Q    Okay.

A    When she - - When she left and went down the hallway, I was
talking to Mon and I asked him what happened and he was
telling me, "Neisha and water." And then next thing you know,
I just hear Vanessa screaming and hollering.

Q    What do you hear her screaming and hollering?

A    "Neisha [is] not breathing."

Q    What did you do?

A    What I done was I got up, I had put Mon down right there by
the bed - - Well, I think I had sat him on the bed. And I went
down to see what she was talking about. When I walk into the

8

room, Miyah was sitting at the table, Vanessa was standing up right there (Indicating). So I was like, "What you - -What you were talking - -What you said?" And then when I - - when - - and she said, "Neisha [is] not breathing." So I pulled the cover back and that's when I saw that her skin looked like it was drawn - - like raw, drawn back and stuff.

Q    What did you do?

A    Well, actually, I really had to catch my head cause, you know, I never saw nothing like that in my life before. And, like, I told her - - She was asking me - - She was, like, uh - - What she was saying? She was asking me what happened and stuff. But she was on the phone when - - when she was talking to me.

Q    When did she leave the room?

A    She?

Q    Yeah.

A    She never - - She didn't leave the room til after - - Well she walked out and she was saying - - she was trying to figure out what number to call. I told her to dial 911, - -

Q    Okay.

A    - - cause she was on the phone with her sister, I think.

Q    How you know it was her sister?

A    Cause I heard her say Andrea['s] name.

Q    Okay. And what did you say?

A    I said, "Man, you need to get off the phone and call the ambulance."

Q    All right. Then what were you doing?

A    I was standing up in the room?

Q    Okay. And then?

A    She called - - She called the ambulance and she started doing what the ambulance was telling her to do. And then she had told me that the people said to put Neisha on a flat surface.

Q    All right. So what did you do?

A    I picked her up and brought her to the dining room - -

Q    Uh huh.

9

A       - - and laid her down on the floor.

Defendant testified he performed CPR on Ray'neisha as instructed by the 911 operator. The ambulance arrived soon after. Expert evidence showed Ray'neisha's body was in full rigor mortis at the time she was "discovered" in the trailer.

Defendant testified the police arrived at the scene and took him and Ms. Edmond to the police station. He explained that he lied to the police in his first statement when he told them he was home sleeping that night. While he explained that he lied because he did not want Ms. Edmond's babies to be taken away from her for leaving them alone all night, he denied harming the two victims.

The DVD recording of Defendant's last statement to the police was introduced and admitted into evidence. A review of the last statement indicated Defendant was gone most of the day. When he arrived home, he awakened Ms. Edmond to get dressed to go to work. He did not recall having much interaction with the children but recalled that he took Ms. Edmond to work around 9:45 p.m., and that they did not bring the children with them. Defendant stated Ms. Edmond told him on the way to work she had whipped Ray'neisha for pooping on herself and that he told her she should not have done so. After he left Ms. Edmond at work, he went to the Gemini around 10:15 to 10:30, where he met P.J., Emmanuel, and Adam. According to Defendant, he stayed at the club until 12:40 or 12:45 a.m. and then went to play a video game at Adam's house. He stated he left Adam's home around 4:00 a.m. and returned to the trailer. He explained he left the car running while he ran in and telephoned Ms. Edmond at work, estimating this occurred around 5:00 a.m. He admitted he did this so Ms. Edmond would think he was at the trailer all that time. He stated he did not check on the children before

10

leaving to meet Ms. Edmond at work. When they returned to the trailer, he went to sleep but was awakened by Ms. Edmond showing him Raymon's feet. Defendant stated he told her to get Raymon some clothes so they could bring him to the doctor. When Ms. Edmond went to the children's room, she started crying out, "Neisha."

Defendant testified the water in the shower was hot when just the hot water was turned on but it was not hot enough to burn him.

Q    Okay. Tell me something. That water was hot, correct?

A    That's what they said.

Q    No, that's what you said.

A    What I said?

Q    You said the water was hot.

A    When?

Q    When?

A    When I said the water was hot?

Q    On the video.

A    No, when did I say - - what I said the water was hot for?

Q    Didn't you say you took a shower and it scalded you.

A    No.  I said I took - - What I was saying was that when I took the shower - - I didn't actually - - I didn't explain that part right there.

Q    Uh-huh.

A    I didn't actually explain that part right there about the shower. I didn't cut the cold water on with the hot.

Q    When?

A    That was a while back. That wasn't no time close to right there. That was, like, back when - - a couple months after we moved in.

Q    Okay. So what you're telling me - - So, you said, and explain to the Court, let me make sure I understand, that when you just slip the hot water on and you stepped in the shower without turning on the cold, you burned yourself.

11

A    I didn't actually burn myself ; like, the water was just hot. I stepped out of it.

Q    It was so hot you had to step out.

A    Shit, I step in the hot water like that when I'm in jail.

Q    I understand.

A    Not that hot.

 . . . .

Q    Okay. So it's a simple question, really.  You knew the water coming out of that - - out in that bath tub, that shower, was hot.

A    If I knew what was coming that was hot?

Q    Yes.

A    Yeah, I know it - - I know it now.

Q    Did you know it back then when you were living at 1123 Spencer Loop?

A    That the water come out that hot?

Q    Yes.

A    Not hot like you explain it.

Q    Well how about how you explained?

A    No, I saw hot like they explained. I saw that  right there on the - - how they was explaining it to me how hot it was.

Q    Well, they never - - they never took a shower in there. You're the one that told them you took a shower and you had to step out cause it was so hot you burned yourself.

A    Yeah, cause I had to get the cold water on.

Q    Okay. So let's go back to it. When you just turn the hot water on, but no cold water in that bathtub, - -

A    Uh-huh.

Q    - - or in that shower, it was too hot to stay in it right?

A    I'm pretty sure if you was at your own house and you just cut the hot water on, it's gonna be hot.

Q    Okay. We're not talking about my house. We're talking about 1123 Spencer Loop.

A    Okay. But I'm saying anytime anyone put on hot water, the water's gonna be hot, if you just turn on the hot water.

12

Q Okay. How would you - - If you were going to do it, how would you put both of those children in the tub at the same time without them splashing; can you explain to the Court how you would do that?

A How I would put both of the kids in the tub without them splashing?

Q Yeah. Let's assume you just turned the hot water on with no cold water. Okay?

A Assume?

Q Yeah, assume. How would you take Ray'neisha and Raymon and put them in the tub at the same time without them splashing and getting water burns on their arms or their chests? How would you do that? Can you explain that to the Court?

A No, sir.

Q So would you agree with me that whoever put them in the tub did it one at a time?

A You say can I agree with you?

Q Would you agree with me?

A I'm not sure.

Q Well, again, can you think of any way that anybody could have put those kids in that tub together at the same time without them getting splash burns on their upper body?

A I'm not sure.

Q You're not sure?

A No, sir. I guess we got - - we both got two hands. If you got two hands, you can put two people in the tub at the same time, right?

Q Okay. So how would you hold Ray'neisha and how would you hold Raymon in the tub - - please, if you could sit there and demonstrate that, how would you do that without them kicking, splashing, you know, getting water on their upper bodies; how would you do that?

A I'm not sure.

Q You think it's possible?

A I don't know. Anything possible if you do it.

Q Right. Anything's possible if you do it. But how would you do it?

A How would I put both of them in the tub?

Q At the same time, without them getting splash burns on their upper body?

A I don't know.

Q Okay. So you would agree with me that it's pretty much impossible?

MR. LEGROS:

 Objection. He said he didn't know. I think that's a mis-characterization of the cross examination.

 MR. ODINET: This is a different question.

 THE COURT: I'll permit the question.

MR. ODINET: (Continuing)

Q Would you agree with me that it's impossible?

MR. CHARLES:

A What's the question?

Q That it's impossible to put Ray'neisha in the tub and Raymon in the tub at - - one person to do it, at the same time, without them getting splash burns on their arms, upper bodies, back?

A I'm not sure.

The State's witness, Adam Reed, Defendant's friend, testified he and Defendant planned to go to a club on the night of January 26, 2011. Defendant told him he would pick him up after he left Ms. Edmond at work. Mr. Reed recalled Defendant picked him up around 10:00 p.m. Emmanuel Barnes was with them. Mr. Reed did not recall seeing Defendant earlier that day. He testified he and Defendant stayed at the Gemini until 1:00 a.m. He claimed neither he nor Defendant had anything to drink or did any drugs at the club that night. After the club closed, the two, along with another friend, P.J., went to Mr. Reed's grandmother's house. Defendant left to bring P.J. home. Mr. Reed was under the impression the Defendant would be returning. He did not recall receiving any calls

from Defendant.  Mr. Reed's testimony indicated Defendant was gone about twenty minutes before he returned.  He testified Defendant left around 3:00 a.m.

Mr. Barnes, also called by the State, testified he met Defendant and Mr. Reed at the club between 8:00 and 9:00 p.m.  Emmanuel testified the group stayed at the club until a fight broke out.  He estimated it was around 12:00 a.m. when they left the club.  He recalled Defendant dropped him off at his girlfriend's house after 1:00 a.m.

Captain Robert Green investigated Ray'neisha's death while employed as the crime scene lieutenant by the Iberia Parish Sheriff's Office.  He collected the evidence and photographed and videoed the scene.  Captain Green was present when the Acadiana Crime Lab conducted a hot water test to determine the temperature of the bath water in the trailer.

The parties stipulated to the results of the hot water test depicted on the video which was admitted into evidence and shown to the trial court.  Additionally, the lab report of the water test was also admitted into evidence.  The lab report states in pertinent part:

> Bathtub measurements were documented, and the water temperature from the bathtub faucet was recorded.  The first test was a "Running Water Temperature" test.  The hot water only from the bathtub faucet was turned on, and the water temperatures monitored from 0 seconds to 60 seconds.  At 0 seconds (initial temperature recording), the temperature was 79.6 degrees Fahrenheit.  At 5 seconds, the temperature quickly rose to 167.4 degrees Fahrenheit, and at 60 seconds, the temperature still maintained a level of 176.7 degrees Fahrenheit.
>
> The second test was a "Fill Test", which monitored the time it took to reach a 5 inch water level in the bathtub, as well as the temperature levels reached when measured in the middle of the tub at mid-depth during the fill time.  The bathtub reached the 5 inch water level in approximately 4 minutes and 33 seconds.  During this test, the water temperature was 178.0 degrees Fahrenheit at the 1 minute mark.  At

15

the 3 minute mark, the temperature was 147.2 degrees Fahrenheit. At the 5 minute mark, the temperature was 127.1 degrees Fahrenheit.

Dr. John Lopoo, a board certified pediatric surgeon at Pediatric Surgery of Louisiana in Baton Rouge, Louisiana, testified he treated Raymon for burns on January 27 and 28, 2011. The medical records introduced into evidence indicate Raymon was at the facility from January 27 to February 8, 2011. Dr. Lopoo testified as follows:

Q      Okay. [Exhibit] Thirty-two is a picture of the child's back?

A      Yeah. It's a difficult picture to interpret, but it looks like there are some bite marks and maybe some bruises on the child's back. But, yes, this is a child's back, it looks like.

Q      Okay. With the same information, child - -

A      Right.

Q      - - and treating physician.

Q      Okay. [Exhibit] Thirty-three?

A      Same information. A picture of the child's backside and perineum, with blistering from the burns.

Q      [Exhibit] Thirty-four?

A      Same child's information with a similar picture of the child's buttock, particularly the right buttock.

Q      Again - -

A      With blistering and burn obvious.

Q      State's Exhibit Number 35?

A      Same patient information. This is a picture of the child, showing his left leg has burns up to the mid-calf, the dorsum of his foot, and lateral ankle have blistering consistent with the burns.

Q      State's Exhibit Number 36?

A      Same child's information. Right foot showing a very small blister over the little toe. And I don't see much else on that one.

Q      [Exhibit] Thirty-seven?

A	Another picture of the left leg, same child, with large blistering of the dorsum of the foot and other, looks like, busted blisters up to the distal calf.

Q	Dorsum of the foot being sort of the top of the foot?

A	Right.

Q	Thirty-eight?

A	This is the same child information. This is a picture of the right foot, where it's showing blistering consistent with burns along the lateral edge of the foot and ankle up into the distal calf.

Q	{Exhibit] Thirty-nine?

A	Same child information, showing both knees and lower legs. There is some blistering present on the left side. And it's hard to interpret the right leg.

	. . . .

DR. LOPOO:

A	Blistering present on the left leg consistent with burning. And the right leg is difficult to interpret. There's - - Looks like there's some liquid here. I don't know if that's - - I don't know what that is.

MR. ODINET: (Continuing)

Q	[Exhibit] Forty?

DR. LOPOO:

A	Forty is another picture with the same child information, looks like it's taken at the same time, showing discoloration of the right buttock.  I assume that's possibly the burn area, but it's hard to tell by this picture.

Q	[Exhibit] Forty-one?

A	Same child information. This must be a different day. Is that right? Is there a date? I know this is the date on this one. What is the date on this one?

	. . . .

DR. LOPOO:

Q	Okay. So this is a picture of the same child information below. It's taken a day later. It's showing the child's buttock area and it has a little more mature area of burn, where the skin is starting to debride off of the burn, the burned skin is starting to

17

fall away, leaving either dermis or burned area underneath. So you can see it's a maturing burn there.

Dr. Lopoo was of the opinion Raymon's burns were second degree burns. He testified as to the temperature the water must reach to cause such burns, explaining:

Q    If that child had been subject to being exposed to a hundred - - call it a hundred and eighty degree water, how long would it have taken for those burns to occur?

A    Seconds or less. I mean, just contact would have done it. A hundred and thirty-seven degrees is the point at which water burns skin and - -

. . . .

DR. LOPOO:

A    Hundred and thirty-seven degrees is generally accepted to be the temperature at which skin burns. So at a hundred and eighty degrees, it would burn relatively quickly or very quickly.

Dr. Lopoo further testified Raymon had old rib fractures, bite marks, and bruises on his body.

Gilfford Saravia, Chief Investigator with the Iberia Parish Coroner's Office, testified he arrived at the crime scene around 1:42 p.m. on January 27, 2011. He recalled, after refreshing his memory from his report, Ray'neisha's body was in full rigor mortis at that time.

Dr. Christopher Tape, a forensic pathologist, was accepted as an expert in forensic pathology. On January 28, 2011, he conducted an autopsy on Ray'neisha. He gave expert testimony as follows:

Q    What did you determine as the manner of death for Miss - - Miss Hudson?

A    The manner of death was homicide.

Q    Okay. And what was your finding as to the cause of death?

A    Scalding.

18

Q     Was that your initial determination as to the cause of death or did you reconsider a - -

A     That was not my initial determination as cause of death.

Q     Okay. What was your initial determination as the cause of death?

A     Initially, I had the cause of death as smothering.

Q     Okay. And why the change from smothering to scalding?

A     Basically in this case, there were a lot of things going on. There were a lot of injuries. One of the first things I noticed was that there was petechial hemorrhages in the eye and there was a laceration of the frenulum, which is the connective tissue on the upper lip. There's different reasons you get a frenulum laceration, but one of the reasons is smothering. In this case, I saw the scald injuries I knew they were severe. I took some sections of them to see them and examine them microscopically. I saw these other injuries internally and externally. I saved the brain and the eyes and the spinal cord. When I - - So when I was thinking of smothering, when I went back to review this, first of all, I didn't know that the other child had been in the ICU for so long. I didn't realize he had been burned so badly. I re-examined the pictures and I came to the conclusion that my smothering was - - I should have moved it down on the list, that autopsies diagnosis of exclusion, and you go and can you exclude natural disease, can you exclude any sort of  infection, can you exclude a gunshot wound, or a stab wound.  I had excluded all of these things and I was to the point where I was at smothering, but then I realized I had not properly excluded the scalding injuries and I realized that these were more likely to be the cause of death in this case.

Q     So Ms. Hudson had indicia of smothering, meaning the torn frenulum and petechiae in the eyes; is that correct?

A     Evidence of smothering.

Q     Evidence.

A     Sure.

Q     I guess that's the proper term. Okay. So but your final determination as the cause of death was scalding?

A     That's correct.

Q     And could you explain to the Court how scalding would cause a child to die?

A     Scalding is an immersion injury caused by hot water, typically. It can be other fluids, but it's typically hot water. Whatever the

19

reason for the immersion, your skin protects you from a lot of different things. It protects you from heat and cold. And one of the main things it does is it holds your fluid in, and it also protects you from infection. So when you lose a large segment of this skin, as this child did, first of all, you're exposed to the environment, so you get hot or cold very easily, but more important, you lose fluid very rapidly. You start dehydrating. In combination, the actual mechanism of death is thought to be a loss of fluid and/or thermal dysregulation, where you're having difficulty staying warm, basically. They get very cold or very hot. If they survive those two threats, then infection is often a cause of death.

Q    Okay. In your - - In the course of performing your autopsy, did you find any thermal burn or scalding injuries on Ms. Hudson from the waist up?

A    No, sir.

Q    Where were the scalding injuries located?

A    All of the scalding injuries are on the lower extremities and the buttocks. They're prominent are [sic] on her shins. There's some sparing to the back of the knees.

Q    Okay. Do they go all the way down to the feet?

A    Yes, sir.

      . . . .

Q    Looking at [Exhibit] 55, again. So no burns, you say, in the lower, mid back. Is that correct?

A     Right. Really from the buttocks above, there are no burns present.

Dr. Tape was of the opinion Ray'neisha's injuries were consistent with an immersion burn. He explained in pertinent part:

Q    Doc, can you determine if this was a splash burn, an immersion burn?

A    It's most consistent with an immersion burn.

Q    Okay.

A    Any sort of accidental splash burns, typically, you get splash marks and it's not - - you don't have a defined line where it's all above or all below. You'll get burns on your hands. If the child falls in, their hand, their upper body and their hands are

20

gonna be burned. If they're splashing or kicking around, they're gonna get burns on their upper body. If they're immersed, classically the child scrunches up, they squat up, to try to protect their self as much as possible. Their shins get burned and they get sparing kind of behind the knees, their buttocks get burned, but there's nothing above.

Q     Did Ray'neisha have sparing behind her knees?

A     Yes.

Q     When you say sparing, so the area behind the knee where the joint bends up, is the knee bends up and the water doesn't get to that?

A     That's right.

Q     And so that skin doesn't get burned?

A     Surely not as badly.

A     Okay. And no burns to the top of her thighs, correct?

Q     Not the kind of scalding burn, not the kind of sloughing burns that - - -

A     That you saw - - you see on the shins, - -

Q     On the shins. That's right.

A     - - in the front of the knees. Okay. And the burns go all the way up the buttocks?

Q     Yeah. Both buttocks are prominently burned.

A     Okay. And the - - up into the groin area?

Q     There's some sparing in the groin area.

        THE COURT:  I'm sorry, some what?

Dr. TAPE:

A     There's sparing in the groin area on the anterior body, on the front of the body.

MR. ODINETE: (Continuing)

Q     Sparing?

DR. TAPE:

A     Sparing, as in there's no thermal injury there.

21

Dr. Tape testified as follows regarding the temperature needed to cause the type of burns suffered by Ray'neisha:

DR. TAPE:

A    The literature - - They measured and they did adults and they put their hand under hot water and they found that, they measured, first of all, how quickly it took to burn and then how long it took to burn to get a full thickness burn. They only measured water up to one hundred and fifty-eight degrees. At one hundred and fifty-eight degrees, there was a full thickness burn in less [sic] a second. It's described in the literature that they believe that children will burn easier. Nobody really knows, because they haven't done that experiment, sir.

Q    Okay.

A    Up to one eighty, I would say that it'd be same idea, less than one second.

He further testified:

Q    Okay. If you could, I want to take you, as we go through these,

State's Exhibit Number 61.

A    Sixty-one is a closeup of a round well healed scar on the body. I believe that's on the hip. It's a closeup.

Q    Okay. So not in the same time period as the scalding burns, correct?

A    That's correct. It's healed. It's formed a scar, basically.

Q    And how many of these types of burns and what location on the body did Ray'neisha have them?

A    On the abdomen, the pelvis, and of the external genitalia, on the vulva.

Dr. Tape was of the opinion these scars were weeks old. He testified the victim also suffered from parenchymal hemorrhages to the heart and scalp hemorrhages which were consistent with injury from a blunt force. When asked by the State whether the blunt force was "[c]onsistent with a fist or an object like a hammer or something of that nature," Dr. Tape answered, "It could be." Dr. Tape summarized the injuries to Ray'neisha:

Q      Doctor, other than the scalding injuries, the most acute injuries I think you indicated, would be to the pericardium, the heart area?

DR. TAPE:

A      Right. So the most acute is the scalding injuries and then the parenchymal hemorrhages of the heart and some portions of the scalp show early inflammatory response, likely occurred shortly before death, approximately four to twelve hours is what I put in my report.

A      Okay. So could the child have been beaten in the chest area such as to cause the injuries to the heart and then be scalded and you have the same sort of findings on autopsy, sort of concomitant to beating with blunt force to the chest and then scalding?

A      It could have, yes.

Q      Okay. The types of injuries that you found on Ray'neisha, the scalding, the blunt force injuries, could those have been accidental?

A      Any one of them could potentially be accidental. When you have more, the more you have, the more likely that it is that they're not accidental.

Q      Okay. So taken together, it's consistent with non-accidental injuries and abuse of the child?

A      Yes.

Q      Abuse that had been going on at least over a period of days, if you don't take into account the small scars, correct?

A      That's correct.

Dr. Tape acknowledged the injuries indicated someone put their hand over Ray'neisha's mouth to quiet her screaming from the pain of the scalding. The autopsy report prepared by Dr. Tape provides:

The decedent was a 4-year-old black female child whose mom called 911 for an unresponsive child. EMS arrived on scene to find her apneic/pulseless and in rigor mortis. Another child in the home was found to have scald injuries and required hospitalization. The home hot water heater was tested to 180 degree Fahrenheit according to investigators.

23

The most significant finding at autopsy is extensive scald injuries to the lower extremities and buttocks. Multiple acute and remote injuries to the head, torso and extremities are present, but none of which are lethal in nature. Neuropathology shows no injuries except for epidural hemorrhages of the spinal cord. Ophthalmologic pathological examination of the eyes grossly and by histology shows no injuries. Toxicology is negative. Although there is no gross evidence of sexual assault, a sexual assault kit has been performed with oral, vaginal and anal swabs with kit being sealed and delivered to the Detective L. Boudreaux. In addition, fingernail scrapings and cuttings have been performed and also delivered to the detective. No natural disease is present. No evidence of infection is present. No congenital or anatomic abnormalities are noted. Toxicology is negative.

Histological examination of injuries can be theoretically dated with estimates based on types of healing response. These date ranges should be used as a rough guideline only as there are many variables involved and the literature is incomplete. By histology, the most acute injury is likely to be the thermal scald injuries to the lower extremities. There is very little to no inflammatory response indicating the injury must have occurred within hours of death (less than 4 hours). The parenchymal hemorrhages within the heart and some portions of the scalp hemorrhages shows early inflammatory response and most likely occurred shortly before death (approximately 4-12 hours). The intercostal muscle tendon sheath hemorrhages show later inflammation and beginning of wound formation indicating they occurred approximately 1 day prior to death (approximately 12-24 hours). The injuries to the right adrenal gland, liver, portions of the scalp hemorrhages, epidural hemorrhage of the spinal cord and rib fracture show later inflammation and wound formation likely occurring days prior to death (approximately 3-6 days). There is a dermal scar underlying one of the round scars on the abdomen which is likely to be weeks old approximately.

The pattern of scald injuries on the lower body in this case are similar to those seen in forced, non-accidental immersions. There is sparing on the backs of the knees, and fronts of the thighs with most damage on the shins and buttocks indicating the legs were tightly flexed at the hips and knees. There are no scalds on the hands or upper body arguing against an accidental immersion. The other scalded child in the home had a very similar injury pattern according to reviewed pictures.

Dr. Tape testified the scalding occurred within less than four hours of the time of death and he estimated Ray'neisha's death as a result of the scalding was "instant," meaning within half an hour from time of injury. He also testified for

24

full rigor mortis to occur it would take six to twelve hours. Based upon the testimony that the body was found at around 1:30 p.m., Dr. Tape was of the opinion that the time of Ray'neisha's death would have been between 1:30 a.m. to 7:30 a.m. On cross-examination, he was of the opinion the time of death was between 7:00 and 8:00 a.m.

Melanie Olivier, an EMT with Acadian Ambulance, recalled receiving a call for assistance at Spencer Loop on January 27, 2011. When she arrived at the trailer, she was informed there were two other children present in the trailer in addition to the victim. Ms. Olivier testified she found the two other children and began getting them ready to go to the hospital. She discovered one of the children, the two-year-old boy, had an oozing blister on top of his foot. She testified when she asked what happened to his foot, he replied, "Mommy did it."

Nicolette Joseph, a forensic interviewer with the Children's Advocacy Center, interviewed Ray'miyah on January 27, 2011. Ms. Joseph testified her notes indicated Ray'miyah was five years old at the time of the interview. The video recording of the interview was introduced into evidence at trial and viewed by the trial court.

A review of the recorded interview indicates Ray'miyah told Ms. Joseph she was four years old at the time. Referring to Raymon as "Mon," Ray'miyah told Ms. Joseph that Mon had a "bobo on his leg" and "Jamal put him in hot tub." Ray'miyah, when asked what happened to Ray'neisha, stated Jamal whipped "Neisha" with a hammer. She explained Neisha had red on her legs. Additionally, she stated Jamal gave Neisha a bath and put Neisha in a hot tub. When asked where her mom was at the time, Ray'miyah indicated her mom was at the trailer.

25

She stated several times her mom was sad. Ray'miyah told Ms. Joseph Jamal put her in a cold tub.

The transcript of Ray'miyah's testimony given at a November 18, 2013 hearing was introduced into evidence in lieu of her testifying at the trial. She was seven years old at the time of that testimony. When asked during the hearing how Ray'neishia died, Ray'miyah explained:

Q    Do you know how Neisha got to heaven?

A    She died.

Q    When Neisha died, who were you living with?

A    My momma.

Q    Who else?

A    Jamal.

Q    Who?

A    Jamal.

Q    You see Jamal in the courtroom today?

A    Yes.

Q    Can you point him out?

A    (Witness indicating)

Q    What color is he wearing?

A    Pink.

Q    Pink? Is this Jamal?

A    Yes.

Q    You said your momma. What's your momma's name?

A    Vanessa.

Q    And Jamal, you. Who else was living there?

Q     Anybody else?

A     Me.

Q     What about your brother?

A     Yes.

Q     How did Neisha get to heaven?

A     She was in a hot tub.

Q     She was in a hot tub?

A     Yes.  And her leg got peeled.

Q     Was anybody else in the hot tub?

A     My brother.  My two little sister [sic] and me.

Q     Your little brother, your sister and you.  Did you get hurt?

A     No.

Q     Did your brother get hurt?

A     Yes.

Q     How did he get hurt?

A     His foot.  He had to go to the doctor.

Q     Who put y'all in the tub?

A     Jamal.

Q     Where was your momma when Jamal put y'all in the tub?

A     Work.

Q     Did somebody tell you that or do you know that?

A     I know.

Q     Did anybody tell you what to say?

A     Neisha and Janae.

27

A    No.

     . . . .

Q    Okay.  Can you tell the Judge, and Mr. Gary, and me do you remember what happened the night your sister died?

A    Yes.

Q    The night Neisha died?

A    Yes.

Q    What happened?

A    When we had to go to sleep --

Q    In the microphone.

A    When we had to go to sleep and we woke up, her leg got peeled.

Q    Do you know how her leg got peeled?

A    No.

Q    Did her leg get peeled before or after she got put in the tub?

A    Before.

Q    Do you know why she got put in the tub?

A    No.

Q    Do you know why Ramon [sic] got put in the tub?

A    No.

Q    Do you know why you got put in the tub?

A    No.

Q    Where were y'all sleeping?

A    On the floor on the mattress.

Q    On the floor where?  Nice and loud, Baby.

A    On the mattress.

28

Q    On the mattress. And who was sleeping there?

A    Me and my brother and my sister.

Q    You, your brother and your sister?

A    Yes.

Q    Tell me something. What do you call your momma?

A    Vanessa, my mom.

Q    Mom? Do you ever call her Nessa?

A    No.

Q    Did your mom put you in that hot tub?

A    No.

Q    Did your mom put Neisha in the hot tub?

A    Yes.

Q    Yeah? When?

A    (No response)

Q    Was it the night her legs got peeled?

A    Yes.

Q    Who was she there with?

A    Me and my brother.

Q    And your mom?

A    Yes, and uh, Janae.

Q    And who else, Baby?

A    That's it.

Q    You need to speak up, Baby.

A    That's it.

BY THE COURT:

> I think she's saying that's it.

A    And my mom.

BY MR. ODINET:

Q    Was Jamal there?

A    Yes.

Q    Was Jamal there with your mom?

A    Yes.

Q    Are you sure?

A    Yes.

Q.    Your mom wasn't there by herself?

A    No.

Q    Was Jamal there by himself?

A    No.

Q    No.  So your mom and Jamal were together --

A    Yes.

Q    -- when they put you in the tub?

A    No.

Q    When they put Neisha and Ramon in the tub?

A    No.

Q    Were they together?  I need you to speak up, Baby.

A    No.

Q    No?  Who was there?

A    My mom, my brother, my sister and Jamal.

Q        Your mom, your brother, your sister and Jamal?  Y'all were all there together?

A        (No response)

Q        Okay, Baby.  Answer any questions Mr. Gary might have.

CROSS EXAMINATION

BY MR. LEGROS:

Q        Hey, Sweetheart.  I don't want to scare you.  Okay?  Did your momma put Neisha in the hot tub?

A        No.

Q        Was your momma there when Neisha was in the tub?

A        She was at work.

Q        But you said that momma put you and your sister and your brother in the tub.

A        No, Jamal did.

Q        What?  Who did?

A        Jamal.

Q        Was your momma there when Jamal did it?

A        No.  No.

On cross-examination, Ray'miyah suggested she had been put in a hot tub before and had been burned, but no further explanation was given.  Additionally, she testified Defendant put Ray'neisha in the hot tub while her mom was at work. She stated she did not hear her brother or sister scream.  When Ray'miyah was asked, "Did you know the water was that hot?" she responded, "No."  Ray'miyah stated that after Defendant put Ray'neisha in the hot tub, he went to the front room. She did not recall who took Ray'neisha out of the tub or who dressed her.

31

Additionally, she testified Defendant had previously hit Ray'neisha with a hammer but denied he spanked her.

During a search of the trailer, a hammer was found. Claire Guidry, an expert with the Acadiana Crime Lab, testified she did a DNA analysis of the hammer. DNA swabbings were taken of Defendant, Ms. Edmond, Raymon, Ray'miyah, and Ray'neisha. Swabs from the head, claw, and handle of the hammer were obtained. The report was introduced and accepted into evidence. Ms. Guidry's testimony and the report indicate a mixed partial DNA profile was obtained from the head, the claw, and the handle. Ray'neisha, Ms. Edmond, and Raymon could not be excluded as potential contributors to this mixed partial DNA profile. Defendant and Ray'miyah were excluded as potential contributors based on the DNA samples.

Laurene Theriot, an investigator with the Department of Children and Family Services, interviewed Defendant on January 31, 2011, while he was in the Iberia Parish Jail, because he was named as a caregiver for the children involved in the alleged abuse. During that interview, Defendant told Ms. Theriot he and Ms. Edmond were the children's caregivers. He admitted he had more responsibility for the children than Ms. Edmond because he was not working. On direct examination, Ms. Theriot was asked, "Did he [Defendant] also admit to you that when he was giving the statement to the cops, that he was playing the cops?" She responded, "Yes, he told me . . . he was - - that was his term to be playing the cops."

Ms. Theriot also spoke to Ray'miyah. She asked Ray'miyah what happened to Raymon's foot. Ray'miyah indicated Defendant whipped Raymon. Additionally, Ray'miyah said Defendant whipped Ray'neisha. Ms. Theriot

testified her notes of the interview with Ray'miyah indicated she would get put in a cold bathtub, but Raymon and Ray'neisha would be put in a hot bathtub. Ms. Theriot explained her notes did not indicate who put the children in the tub.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are two errors patent.

Defendant was entitled to a jury trial in this case. *See* La.R.S. 14:30, 14:93.2.3, and La.Code Crim.P. art. 782. Louisiana Code of Criminal Procedure Article 780 (emphasis added) was amended in 2013,[4] to provide as follows:

> A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by the judge.
>
> B. The defendant shall exercise his right to waive trial by jury in accordance with Article I, Section 17 of the Constitution of Louisiana. The waiver shall be by written motion filed in the district court not later than forty-five days prior to the date the case is set for trial. *The motion shall be signed by the defendant and shall also be signed by defendant's counsel unless the defendant has waived his right to counsel.*
>
> C. With the consent of the district attorney the defendant may waive trial by jury within forty-five days prior to the commencement of trial.
>
> D. A waiver of trial by jury is irrevocable and cannot be withdrawn by the defendant.

The effective date of the amendment to Article 780 was June 17, 2013, thus, the requirement that the waiver be in writing was in effect at the time of the August 29, 2014 waiver in this case. The record reveals the written jury trial waiver was signed by defense counsel, but not by Defendant as required by Article 780, as

---

[4] La.Acts 2013, No. 343, § 1.

33

amended. However, Defendant and his attorney were in open court when the trial court addressed Defendant's right to a jury trial and his waiver thereof.

In *State v. Bell*, 13-1443 (La.App. 3 Cir. 6/4/14), 140 So.3d 830, this court held the absence of a written waiver of a jury trial, as required by La.Code Crim.P. art. 780, was harmless error where the defendant and his counsel were in open court at the time the trial court addressed the defendant's right to a jury trial and his waiver thereof. We find the error in failing to obtain a signed written waiver by Defendant, in violation of La.Code Crim.P. art. 780, is harmless under the facts of this case.

Next, the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. The trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion, and to file written proof in the record that Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

**LAW AND ANALYSIS**

Defendant argues the evidence was insufficient to prove he committed the two crimes for which he was convicted. Alternatively, he argues he is guilty of only criminal negligence for leaving the children alone. Defendant asserts the State failed to prove he had the specific intent to kill and argues that the lesser included offense of manslaughter was, at best, what the State proved. He contends:

34

Perhaps Jamal had too much responsibility placed upon him. He made sure his child was attended to, now he had t[o] watch Vanessa's children. Perhaps Jamal, who had been unemployed for two months, just lost it. There appeared to be no problems when Jamal dropped Vanessa off at work. There was no indication that Jamal had the specific intent to kill or inflict great bodily harm on either child. Rather, this young, inexperienced father may have been in the grip of a sudden heat of passion, brought about by his environment, the loss of his earning ability as the head of household, his heat of blood compounded by his anger at Vanessa for leaving him alone with her children all night.

In *State v. Carter*, 14-926, pp. 2-3, 6 (La.App. 3 Cir. 4/1/15), 160 So.3d 647, 649, 651(alteration in original) this court explained:

The standard of review for an insufficient evidence claim is well-settled:

In *State v. Bryant*, 12-233 (La.10/16/12), 101 So.3d 429, the Louisiana [S]upreme [C]ourt addressed the sufficiency of the evidence claims, reiterating that the appellate review of such claims is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676 (La.1984). In applying the *Jackson v. Virginia* standard, the appellate court must determine that, when viewed in the light most favorable to the prosecution, the evidence is "sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *Bryant*, 101 So.3d at 432. *See also* La.Code Crim.P. art. 821.

*State v. Williams*, 13-497, p. 3 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1239, *writ denied*, 13-2774 (La.5/16/14), 139 So.3d 1024.

. . . .

Though it is the role of the fact finder to make credibility determinations, in order to affirm a conviction on appeal, "the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt." *State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

35

***Second Degree Cruelty to Juvenile***:

Defendant argues there was insufficient evidence to prove he was guilty of second degree cruelty to Raymon. He also asserts Ms. Edmond was the perpetrator. He does not challenge that Raymon's injuries were due to abuse or that the injury was a "serious bodily injury," as defined in La.R.S. 14:93.2.3(2). The only issue he asserts is whether the State presented sufficient evidence to prove beyond a reasonable doubt he committed this crime.

Louisiana Revised Statutes 14:93.2.3(A) provides:

(1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

Raymon said his mom caused the injury. Ray'miyah stated, both in her interview with Ms. Joseph and in her testimony admitted into evidence at trial, Defendant caused the injury. On direct examination, Ray'miyah testified both Defendant and her mom put her brother in the hot tub. The trial court was in the best position to make determinations regarding the credibility of the witnesses and could reasonably conclude from the record that Ray'miyah's testimony was more convincing than her younger brother's. Applying the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), standard, we find sufficient evidence was submitted by the State to find Defendant committed the crime of second degree cruelty to a juvenile.

*First Degree Murder*:

Defendant argues he did not have the specific intent to kill or inflict great bodily harm to Ray'neisha. Additionally, he argues the evidence does not show he was engaged in the perpetration or attempted perpetration of cruelty to a juvenile. He points out he took steps to help Ray'neisha by calling the ambulance and performing CPR. He asserts Ms. Edmond was the culprit in this case and asserts she gave inconsistent statements and testimony. Additionally, he points to evidence of prior injuries to the children, stating:

> The evidence does not show Jamal was engaged in the perpetration or even attempted perpetration of cruelty to a juvenile. However, as Jamal was supposed to watch Vanessa's children that night, he became the prime suspect.
>
> Vanessa told authorities she drove herself to work that night. As it turns out, Vanessa did not drive to work that night. Jamal drove Vanessa to work and then went to the Gemini club with several friends. Vanessa made a regular habit of leaving the children home alone at night. She claims Jamal never told her he was going out that night. Vanessa first told authorities, as she did the grand jury, she checked on the children when she came home. Vanessa admitted she lied, as she never checked on the children when she returned home. Vanessa told the grand jury that after she went to bed she only got up only once, to use the bathroom, at around 8:00 a.m. At trial, however, Vanessa testified that after she went to sleep she did not wake up until around 12:00 or 12:30 the next morning. Jamal first told authorities he was home sleeping as he knew Vanessa would get in trouble for leaving the children home alone. He knew Vanessa did not want her children taken away. Jamal had made arrangements for his child though. He dropped Janae off at Charlene Wilson's house before bringing Vanessa to work.
>
> Vanessa admitted lying about driving herself to work that night. She knew she would get in trouble for leaving her kids alone, something she did all the time. She lied to the grand jury about checking on the children when she got home so as to not look like a terrible mother. But Vanessa was a terrible mother. Vanessa was never asked to explain the old injuries that Rayneisha [sic] and Raymond [sic] had. Dr. John Lopoo testified Raymond [sic] had what appeared to be bite marks and bruises on his back. There was blistering and obvious burns to his left leg up to the mid-calf and on the dorsum of his foot. Raymond [sic] also had burns on the lateral

edge of the foot and ankle up to the calf. He also had burns on the buttocks where the skin was starting to [debride] off. Raymond [sic] also had some old rib fractures. When Melanie Olivier, EMT with Acadian Ambulance, asked Raymond [sic] what happened to his foot, he said "mommy" did that.

Dr. Christopher Tape testified Rayneisha [sic] had blunt force injuries to the head and healing abrasions to the face and head. There was a healing abrasion on the right ear. He determined the scalp injuries to be 3 to 5 days old. Dr. Tape determined the time of death to have occurred between 7:00 a.m. and 8:00 a.m. Dr. Tape determined the cause of death was immersion in water that was 160-180°. He felt that the time of death was around 7:30 a.m., and the scalding happened between 3:00 a.m and 7:00 a.m. Dr. Tape was also of the opinion the hemorrhaging to the eyes and the laceration of the connective tissue on the upper lip was consistent with someone holding their hand over the child's mouth . . .

. . . When Ms. Theriot asked Raymiyah [sic] what happened, she said Jamal whipped Raymond [sic]. She also said Jamal whipped Rayneisha and she died. She stated she took a bath in the cold tub and the others took a bath in the hot tub. She did not say that Jamal put her in the tub, nor did she say he put anyone else in the tub.

In its brief to this court, the State argues sufficient evidence of Defendant's specific intent was presented: "The defendant had the [presence] of mind to submerge both the four-year-old and the three-year-old into 180 degree temperature water. The record reflects that the defendant had the [presence] of mind to place the children back into the bed after the significant injuries." The State points out, "Raymiyah [sic] also admitted that she had taken a bath in a cold tub but the others took a bath in a hot tub." The State argues:

The evidence reflects that not one but two children were injured -- the defendant acted against one of the children, had the [presence] of mind to place that child in bed and then acted against the other child.

The State charged Defendant under Section A(5) of La.R.S. 14:30, which provides:

First degree murder is the killing of a human being:

. . . .

38

(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.

In *State v. Thomas*, 14-820, p. 4 (La.App. 3 Cir. 3/4/15), 159 So.3d 1115, 1118 (alteration in original), this court explained:

> "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "[S]pecific criminal intent need not be proven as fact but may be inferred from the circumstances of the case and actions of the defendant." *State v. Robertson*, 98-883, p. 6 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, 504, *writ denied*, 99-658 (La.6/25/99), 745 So.2d 1187.

In this case, in order to convict Defendant of first degree murder, the state must establish beyond a reasonable doubt: (1) Defendant had the required specific intent to kill or *inflict great bodily harm* and (2) the victim was under the age of twelve.

The age of the victim is not in dispute. She was only four years old when she died as a result of being forcefully held in scalding hot water and then being left unattended without any effort made to obtain medical treatment until after death and rigor mortis had already occurred. Additionally, based upon the expert testimony and evidence, when viewed in the light most favorable to the prosecution, Defendant was at the trailer when the fatal injury occurred. Moreover, although the evidence indicates Ms. Edmond could have been present when the injury occurred, Ray'miyiah testified Defendant put Ray'neisha in the hot tub, which the trial court could reasonably accept as the most credible evidence.

Thus, the trial court had to determine whether Defendant had the required specific intent to kill or inflict great bodily harm on Ray'neisha when he forcefully

held her in a tub of scalding water long enough to cause severe burns, which resulted in her death within a short time following the immersion.

In *State v. Sepulvado*, 93-2692 (La. 4/8/96), 672 So.2d 158, *cert. denied*, 519 U.S. 934, 117 S.Ct. 310 (1996), the defendant was convicted of the first degree murder of his six-year-old stepson and was sentenced to death. On appeal, the following factual basis was set forth:

> On Thursday, March 5, 1992, defendant married the victim's mother, Yvonne. The next day, Friday, the victim came home from school, having defecated in his pants. Yvonne spanked him and refused to give him supper. Defendant returned home from work at approximately 9:00 p.m. That night, the victim was not allowed to change his clothes and was made to sleep on a trunk at the foot of his bed. On Saturday, the victim was not allowed to eat and was again made to sleep on the trunk in his soiled clothes. At around 10:00 a.m. on Sunday, defendant and the victim were in the bathroom, preparing to attend church services. Defendant instructed the victim to wash out his soiled underwear in the toilet and then take a bath. When the victim hesitated to do so, defendant hit him over the head with the handle of a screwdriver several times with enough force to render him unconscious. Thereafter, the victim was immersed in the bathtub which was filled with scalding hot water.

> Approximately three hours later, at around 1:50 p.m., defendant and his wife brought the victim to the emergency room at the hospital. At that time the victim was not breathing, had no pulse, and probably had been dead for approximately thirty to sixty minutes. All attempts to revive the victim were futile. The cause of death was attributed to the scald burns covering 60% of the victim's body, primarily on his backside. There were third degree burns over 58% of the body and second degree burns on the remaining 2%. The scalding was so severe that the victim's skin had been burned away. In addition to the burns, medical examination revealed that the victim had been severely beaten. The victim's scalp had separated from his skull due to hemorrhaging and bruising. Also, there were deep bruises on the victim's buttocks and groin which were not consistent with accidental injury.

> At trial, defendant admitted that he hit the victim with a screwdriver, but contended that the victim fell into the tub accidentally. However, the state presented expert testimony that the burn marks on the victim's body did not indicate he accidentally fell into the tub, since there were no signs of splash marks that would result from a struggle. The experts testified that the marks were

40

consistent with the victim being dipped or immersed into the scalding water.

*Id.* at 162. On appeal, the defendant argued the state failed to prove he had the specific intent to kill. The court held:

> Though intent is a question of fact, it need not be proven as a fact; it may be inferred from the circumstances of the transaction. *State v. Kahey*, 436 So.2d 475 (La.1983). It is clear from the circumstances detailed in the trial testimony that defendant possessed the requisite intent to kill. The severity of the bruises and burns on the victim clearly indicate the intent to kill or inflict great bodily harm. Medical testimony by both the state and defense experts show that the injuries from the beatings and the scalding were of an intentional, not accidental, nature. The expert testimony and photographs showed that the victim's arms and toes were unburned and there was no evidence of splash marks, indicating that the victim was dipped in the scalding water while unconscious, rather than falling in accidentally. It was undisputed that the victim was six years old, well within the age limit of La.R.S. 14:30(A)(5).

*Id.* at 165.

The cause of death and type of injuries in this case are very similar to those in *Sepulvado.* The trier of fact could reasonably accept the testimony of Ray'miyah that Defendant put the victim in the tub of hot water. Dr. Tape testified the victim died as a result of immersion burns indicated by the pattern and areas burned, as well as those not burned, and that the immersion was intentional and by force, rather than accidental. There was evidence that the child's screams were silenced by her assailant placing his hand over her mouth. There was evidence Defendant, earlier that evening, hit the victim so hard in her chest that he injured her heart. Moreover, we have already affirmed the trial court's finding that Defendant intentionally inflicted serious bodily harm on Raymon during the same time in question. Accordingly, when viewed in the light most favorable to the prosecution, the evidence supports the trial court's finding that Defendant acted with the specific intent to, at the very least, cause great bodily harm to the victim, a

child of tender years. When viewed in the light most favorable to the prosecution, the evidence supports the trial court's finding that Defendant was engaged in cruelty to another juvenile in addition to the deceased victim.

For the reasons stated, Defendant's convictions and sentences are affirmed. The trial court is directed to inform Defendant of the provisions of La.Code Crim. P. art. 930.8, by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record indicating Defendant received the notice.

**AFFIRMED**.